IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE

## STATE OF TENNESSEE v. SHERMAN WINCHESTER BLACKSTOCK

**An Appeal from the Criminal Court for Hamilton County**
**No. 194640     Stephen M. Bevil, Judge**

---

**No. E1994-00004-SC-R11-CD - Decided April 10, 2000**

---

The defendant, who has an IQ of 55 and functions on the level of an eight to nine-year old child, was convicted by a jury for the aggravated sexual battery of a seven-year-old female. The Court of Criminal Appeals affirmed the trial court's findings that the defendant was competent to stand trial, that the defendant voluntarily, knowingly, and intelligently waived his Miranda rights, that the trial court was without jurisdiction to order involuntary commitment and treatment as a mentally retarded offender, and that the defendant should not have been sentenced as an especially mitigated offender. The Tennessee Supreme Court granted the defendant's application for permission to appeal. Although the Court concluded that the evidence does not preponderate against the trial court's finding of competence, the Court found that the evidence does preponderate against the trial court's finding of a voluntary, knowing and intelligent waiver of Miranda rights, and further, that the trial court erred in failing to consider the petition for involuntary care and treatment and in refusing to sentence the defendant as an especially mitigated offender. Accordingly, the Tennessee Supreme Court reversed and remanded for a new trial.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Reversed; Case Remanded to Trial Court.**

ANDERSON, C. J., delivered the opinion of the Court, in which DROWOTA, BIRCH, BARKER, JJ., and BYERS, SP.J., joined.

Ardena J. Garth, District Public Defender, and Donna Robinson Miller, Assistant District Public Defender, Chattanooga, Tennessee (On Appeal); and Karla G. Gothard, Executive District Public Defender, Chattanooga, Tennessee (At Trial), for the appellant, Sherman Winchester Blackstock

Paul G. Summers, Attorney General & Reporter, Michael E. Moore, Solicitor General, and Todd R. Kelley, Assistant Attorney General, Nashville, Tennessee (On Appeal); and Gary D. Gerbitz, District Attorney General, and Bates W. Bryan, Jr. and Rebecca J. Stern, Assistant District Attorneys General, Chattanooga, Tennessee (At Trial), for the appellee, State of Tennessee

### OPINION

CHIEF JUSTICE ANDERSON delivered the opinion of the Court.

We granted this appeal from the defendant's conviction for aggravated sexual battery to review two principal issues: (1) whether the defendant – a mentally retarded adult with a full scale IQ of 55 – was competent to stand trial, and (2) whether he voluntarily, knowingly, and intelligently waived his Miranda rights before making a statement to investigating officers. Other questions raised include whether the trial court committed error in concluding that it lacked the authority to grant the defendant's petition for involuntary commitment and treatment as a mentally retarded offender and whether it erred in denying the defendant's request for sentencing as an especially mitigated offender.

The Court of Criminal Appeals affirmed the defendant's conviction for aggravated sexual battery. It held that the evidence did not preponderate against the trial court's rulings, first that the defendant was competent to stand trial and second that he had waived his Miranda rights before making a statement to law enforcement officers. The appellate court further held that the trial court lost jurisdiction to order involuntary commitment after the defendant was in the Department of Correction's custody. Finally, the court held that the defendant did not qualify for an especially mitigated sentence because of the existence of the private trust enhancement factor.[1]

After our review of the record and applicable law, we conclude that the evidence is marginal but does not preponderate against the trial court's finding that the defendant was competent to stand trial. We further find, however, that the evidence does preponderate against the trial court's finding that the defendant voluntarily, knowingly, and intelligently waived his Miranda rights before making a statement to officers. Moreover, we conclude that the trial court erred in concluding that it lacked the authority to order involuntary care and treatment and erred in refusing to sentence the defendant as an especially mitigated offender. The Court of Criminal Appeals' judgment is therefore reversed, and this case is remanded to the trial court.

## BACKGROUND

The defendant, Sherman Winchester Blackstock, was indicted for the aggravated rape of a seven-year-old female. The following is a summary of the evidence at trial. The child testified that in August of 1992, she was in Blackstock's apartment when he laid her on a bed, removed her clothing, got on top of her, and penetrated her. She said that Blackstock said he would kill her if she told anyone what happened.

Deborah Earls, the child's mother, testified that she and her three daughters were staying with Blackstock free of charge off and on until they could find another place to live. Blackstock asked her to leave, and she left shortly before this incident. Earls testified that a friend told her that Blackstock had raped Earls' daughter. After talking to her daughter, Earls asked Blackstock if he had sex with her child. Blackstock initially appeared not to understand but then said "yes, what about it." She told Blackstock that she was calling the police. As to Blackstock's mental capacity, Earls testified that Blackstock shopped for groceries, cooked for himself and her family, and washed

---

[1]     Tenn. Code Ann. § 40-35-114(15) (1997).

clothes on his own. Although Blackstock talked slowly, Earls could understand him and did not know he was mentally retarded.

After the police were called, Blackstock was questioned by Tara Pedigo, a detective for the child abuse unit of the Chattanooga Police Department. Pedigo testified that she read Blackstock his Miranda rights and that he seemed to understand his rights before signing a written waiver. In response to Pedigo's questions, Blackstock said that the child removed her clothing herself. He said that he touched her "in her private" with his "dingaling," but that he did not penetrate her.

Blackstock testified in his own defense, stating that he was born in 1978 and was twenty-four years old.[2] His testimony revealed that he could not read or write, that did not know the shape of a triangle, that he thought the American flag had only three stars, and that he could not count numbers in sequence beyond one through ten. He remembered being scared and nervous when talking to officers and recalled telling the officers that the child told him to take their clothes off and that she unzipped his pants. He denied that he raped the child and denied telling her not to tell anyone what happened.

A number of other witnesses testified as to Blackstock's mental limitations.[3]

Dennis Barwick, the program director at the Orange Grove Center, testified that Blackstock attended the vocational and educational training center for mentally retarded individuals from 1971 to 1982. The Center's records indicated that Blackstock suffers from an organic brain injury and a speech defect and that he sustained head injuries when struck by a car as a child. While Blackstock was attending the Orange Grove Center, testing showed his IQ to be 43 at age fourteen, 58 at age sixteen, and 57 at age twenty. Other evaluations indicated that his functioning was equivalent to a five to six-year-old child and that his social age was like that of a nine-year-old child.

Blackstock's conservator, Walter Grantham, an attorney, testified that he was appointed as conservator in 1991, replacing Blackstock's brother who had been removed for misusing funds. Blackstock's brother had been appointed as conservator in 1981 because of a doctor's certification of Blackstock's permanent mental retardation and inability to manage his own affairs. Grantham said that as conservator, he signed documents for Blackstock, paid his bills, and gave him food stamps and checks on a weekly basis. Grantham related that he treated Blackstock the way one treats a six or eight-year-old child. Lisa Smith, Grantham's secretary, testified that she saw Blackstock weekly and had to explain to him how to use the food stamps each time. Blackstock had a speech impediment and was hard to understand. In her view, Blackstock acted like an eight-year-old child and would not have known he did anything wrong until arrested by police.

---

[2] The presentence report indicates that Blackstock was born in 1959 and was thirty-three years old at the time of trial.

[3] Blackstock attempted to establish a defense of insanity.

Thomas Ford, a clinical psychologist associated with the Johnson Mental Health Center, a state institution, testified that he met with Blackstock three times before trial to determine his competency to stand trial and his mental state at the time of the offense. He determined that Blackstock has an IQ of 55, which was lower than ninety-eight to ninety-nine percent of the general population, and a speech impediment that made it hard to understand him. Although Ford did not give an adaptive functioning test to determine Blackstock's level of functioning, it was his opinion that Blackstock functioned at the level of an eight to nine-year-old child. According to Ford, Blackstock had a difficult time relating information about his life. Ford testified that Blackstock seemed to understand that he had been charged with a serious offense; he told Ford that he did not commit the offense and that he believed his attorney would do a good job. Based on his evaluations, Ford concluded that Blackstock was competent to stand trial and was legally sane at the time of the offense.

Finally, Wanda and Anthony Pasley testified that at the time of the trial, Blackstock had been living with them for approximately six months. Both testified that Blackstock cannot cook, but is able to do yard work and clean the house. Wanda Pasley testified that Blackstock acts like a four or five-year-old child and had to be reminded to bathe regularly. She cashes Blackstock's checks.

The jury found Blackstock guilty of the lesser offense of aggravated sexual battery. The Court of Criminal Appeals affirmed the conviction and sentence. We granted this appeal.

## COMPETENCY TO STAND TRIAL

The Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution prohibit the trial of a person who is mentally incompetent. Pate v. Robinson, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966); Berndt v. State, 733 S.W.2d 119 (Tenn. Crim. App. 1987). The standard for determining competency to stand trial is whether the accused has "the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense." State v. Black, 815 S.W.2d 166, 174 (Tenn. 1991) (quoting Mackey v. State, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975)); see also Dusky v. United States, 362 U.S. 402, 402, 80 S. Ct. 788, 789, 4 L. Ed. 2d 824 (1960) (ability to consult with lawyer and a "rational as well as factual understanding of the proceedings").

Before trial, the public defender filed a petition for a psychiatric evaluation seeking to have Blackstock evaluated both for mental competence to stand trial and his mental state at the time of the offense. The trial court directed that the evaluations be conducted by the Johnson Mental Health Center, a state institution. A report to the trial court dated March 31, 1993, stated the following:

> After completion of the evaluation, we have concluded that [Blackstock's] condition is such that he is capable of defending himself in a court of law. In making this determination, we found that he understands the nature of the legal process; that he understands the charges pending against him and the consequences that can follow; and he can advise his counsel and participate in his own defense.

-4-

No other expert examined the defendant. No evidentiary hearing on the question of competency was held; thus, lay proof as to Blackstock's mental limitations was not heard prior to trial.

## Analysis

On appeal, Blackstock contends that the trial court erred in determining that he was competent to stand trial. He points to evidence of his mental retardation, his IQ of 55, and testimony from several witnesses that he functions on the level of a four to nine-year-old child. Blackstock further argues that the testimony regarding his limited life skills, comprehension, and functioning indicates that he lacked both the capacity to understand the proceedings against him and the ability to assist in his defense. Although Blackstock did not seek or request an evidentiary hearing on mental competency before trial, he asserts that the trial court had a duty to conduct a hearing sua sponte. See Berndt, 733 S.W.2d at 122.

Blackstock contends that State v. Benton, 759 S.W.2d 427 (Tenn. Crim. App. 1988), is a similar case with the opposite result. In Benton, the evidence at a competency hearing revealed that the defendant, age forty-three, was unable to respond to questions asked by a psychological examiner and that he did not know why he had been arrested or why he was being evaluated. The defendant's skills in areas such as communication and coping ability were measured at an age level of four to six years. The defendant had received no education, did not know his childhood history, could not relate the date, month or year, and did not know how to read, write or count. The defendant's lifestyle was extremely limited and required intense supervision. A psychiatrist testified that the defendant had moderate mental retardation, with an IQ of 47. The psychiatrist and a psychiatric social worker both opined that the defendant did not understand the proceedings against him and lacked the ability to assist in his defense. A different panel of the Court of Criminal Appeals held that the evidence preponderated against the trial court's finding of competence.

The present case is different in that there was only one mental health expert who found the defendant competent and no other proof of any kind. The trial court reviewed a report from the Johnson Mental Health Center finding that Blackstock was competent to stand trial. There was no cross-examination or other testimony regarding the Johnson Mental Health Center's findings. Blackstock did not seek a competency hearing, nor did he produce any expert or lay evidence indicating that he lacked the capacity to understand the proceedings against him and to assist his attorney in his defense. In contrast, an evidentiary hearing was held in Benton, and every expert who testified opined that the defendant was mentally incompetent to stand trial. The evidence introduced at the suppression hearing also indicated that Blackstock's IQ and level of functioning were slightly higher than those of the defendant in Benton.

We observe that the issue is close, but we conclude that Blackstock was marginally competent based on the evidence produced and that the evidence does not preponderate against the trial court's determination that Blackstock was competent to be tried. The trial court was entitled to rely upon the results of the psychiatric evaluation, which indicated that Blackstock had the capacity to understand the proceedings against him and to assist in his defense. Moreover, given the single expert's findings and the failure of the defense to request a hearing or to produce evidence of

incompetency, we cannot conclude that the trial court erred in failing to conduct a competency hearing sua sponte. See Berndt, 733 S.W.2d at 122 ("[a]ppellate court may only consider those facts which were before the court when the trial commenced . . . .").

## SUPPRESSION OF STATEMENTS

We now turn to the issue of whether Blackstock voluntarily, knowingly, and intelligently waived his Miranda rights before being interrogated by Detective Pedigo.

Detective Tara Pedigo testified that she questioned Blackstock in her office in the presence of the arresting officer and a Department of Human Services employee. Pedigo said that she read the Miranda rights to Blackstock before questioning him. She said that she explained each right in plain language and that she believed Blackstock understood he was waiving his rights by signing a waiver form. Pedigo testified that Blackstock told her that he could read and write and had attended school through the eleventh grade. When Pedigo asked if Blackstock "understood everything [she] had said," Blackstock responded, "I only did it once, and I won't do it anymore."

Pedigo conceded that she took no notes and made no recording of her advice to Blackstock about his Miranda rights or his responses. She conceded that she did not define or explain the terms "lawyer," "court," or "appointed," and she acknowledged that Blackstock misspelled his own last name on the waiver of rights form. Pedigo agreed that Blackstock's grammar and language ability was poor. She was not aware that Blackstock had attended special education programs, that he had suffered a severe head injury as a child, or that he had an appointed conservator because of his mental retardation and inability to manage his own affairs. Pedigo testified that Blackstock's speech, which was slurred and difficult to understand, became worse during the portion of the interview that was recorded, and that she had to stop the interview several times to ask Blackstock to speak more clearly.

Blackstock's conservator, Walter Grantham, was appointed conservator for Blackstock in 1991, replacing Blackstock's brother who had been appointed in 1981 after doctors certified that Blackstock was permanently mentally retarded and unable to manage his affairs. Grantham's responsibilities include managing Blackstock's financial affairs, signing documents, and giving Blackstock a weekly check for fifteen to twenty-five dollars and food stamps. Grantham testified that Blackstock functioned at a low level and was easily influenced and led by others. Grantham said that Blackstock was able to print his name in a "primitive" fashion but could not otherwise read or write. It was Grantham's opinion that Blackstock lacked the ability to read or understand Miranda rights and could not comprehend a waiver of such rights. Grantham stated that Blackstock viewed him as a source for money and food stamps and did not understand that Grantham was an attorney. As a result, Blackstock did not try to call Grantham or anyone else for help when arrested and remained in custody for two weeks despite having the financial resources to post bail. It was not until Grantham tried to locate Blackstock that Grantham became aware of the charges and posted bail so that Blackstock could be released from jail pending trial.

-6-

Dennis Barwick, the program director at the Orange Grove Mental Health Center, testified that Blackstock was a patient from 1971 to 1982. Blackstock, who was classified as mildly mentally retarded, participated in a training program as a dishwasher under direct supervision. According to Barwick, tests administered in 1980 indicated that Blackstock's IQ was 57 and his level of functioning as measured by a Bender Visual-Motor Gestalt test was equivalent to that of a six-year-old child. Barwick also testified that Blackstock could not read or write.

The trial court found that Blackstock had a "mental impairment," but further found that Pedigo read the Miranda rights to Blackstock and that the recorded interview indicated that Blackstock made "a voluntary waiver, because it does seem that he is cooperating and he is telling what he knows about what happened." The Court of Criminal Appeals affirmed.

## Analysis

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The related provision in the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. In short, a defendant's right against compelled self-incrimination is protected by both the federal and state constitutions. See State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994).

In Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The procedural safeguards must include warnings prior to any custodial questioning that an accused has the right to remain silent, that any statement he makes may be used against him, and that he has the right to an attorney. Id.

The rights protected in Miranda may be waived by an accused "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. As we have explained:

> The relinquishment of the right must be voluntary in the sense that it is the product of a free and deliberate choice rather than the product of intimidation, coercion or deception. Moreover, the waiver must be made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

Stephenson, 878 S.W.2d at 544-45 (emphasis added). Accordingly, the totality of the circumstances must reveal "an uncoerced choice and the required level of comprehension before a court can properly conclude that Miranda rights have been waived." Id. at 545; see also Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986).

The effect of an accused's mental deficiencies or retardation on the validity of his decision to waive <u>Miranda</u> rights has been considered in numerous cases. Charles C. Marvel, Annotation, <u>Mental Subnormality of Accused as Affecting Voluntariness or Admissibility of Confession</u>, 8 A.L.R. 4th 16 (1981 & Supp. 1999). Mentally retarded individuals present additional challenges for the courts because they may be less likely to understand the implications of a waiver. <u>United States v. Murgas</u>, 967 F. Supp. 695, 706 (N.D.N.Y. 1997). As one commentator has suggested, the mentally retarded are "less likely to understand their <u>Miranda</u> rights and the consequences of waiving them, giving rise to concerns about the knowing intelligence of their waivers." Paul T. Hourihan, <u>Earl Washington's Confession: Mental Retardation and the Law of Confessions</u>, 81 Va. L. Rev. 1471, 1492 (1995).

Although there is likely to be a level of deficiency so great that it renders a defendant unable to make a knowing and intelligent waiver, nearly every court to consider the issue has held that mental impairments or mental retardation are factors that must be considered along with the totality of the circumstances. As one court has said, "no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving, and do [sic] so waive, the constitutional rights embraced in the <u>Miranda</u> rubric." <u>Fairchild v. Lockhart</u>, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989). Among the circumstances courts have considered are the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the <u>Miranda</u> rights are explained. As a result, courts tend to reach results that are somewhat fact-specific.[4]

The circumstances in this case are as follows. On one hand, Blackstock was found competent to stand trial by the Johnson Mental Health Center, a determination which encompassed a finding that he had the capacity to understand the proceedings against him. Detective Pedigo testified that she explained the <u>Miranda</u> rights individually; although she claimed to read the rights to Blackstock in "clear" language, she conceded that she did not ask Blackstock whether he knew the definition

---

[4]     In the following cases, waivers were found to be valid. <u>United States v. Macklin</u>, 900 F.2d 948 (6th Cir. 1990) (defendant had IQ of 59; co-defendant's IQ was 70); <u>Moore v. Dugger</u>, 856 F.2d 129 (11th Cir. 1988) (defendant had IQ of 62 and functioned on the level of eleven-year-old child); <u>Reddix v. Thigpen</u>, 805 F.2d 506 (5th Cir. 1986) (mentally retarded defendant); <u>De La Rosa v. Texas</u>, 743 F.2d 299 (5th Cir. 1984) (borderline retarded defendant); <u>Harris v. Riddle</u>, 551 F.2d 936 (4th Cir. 1977) (IQ of 67; sixth grade intelligence); <u>United States v. Young</u>, 529 F.2d 193 (4th Cir. 1975) (below average IQ; limited education and reading ability); <u>Hill v. State</u>, 798 S.W.2d 65 (Ark. 1990) (IQ between 56 and 70; third grade functioning); <u>State v. Brooks</u>, 648 So. 2d 366 (La. 1995) (mildly retarded, but functional); <u>State v. Cook</u>, 332 S.E.2d 147 (W. Va. 1985) (moderate mental retardation). Conversely, in the following cases, statements were suppressed. <u>Henry v. Dees</u>, 658 F.2d 406 (5th Cir. 1981) (IQ between 65 and 69; sixth grade level of education); <u>Cooper v. Griffin</u>, 455 F.2d 1142 (5th Cir. 1972) (defendants with IQs between 61 and 67; low functioning); <u>State v. Flower</u>, 539 A.2d 1284 (N.J. Super. Ct. Law Div. 1987) (IQ less than 70; mental age equivalency of seven to twelve-year-old child).

of such terms as "lawyer," "court," or "appointed." Pedigo was of the opinion that Blackstock appeared to understand his rights, but she was not aware that he was mentally retarded or that a conservator had been appointed because of his inability to manage his affairs. During the interview, Blackstock was responsive to questions, but Pedigo conceded that his speech and communication worsened and that he was frequently difficult to understand. She on several occasions instructed Blackstock to speak more clearly, even reminding him that he had spoken more clearly before the tape recorder had been turned on. Pedigo conceded that the arresting officer and a Department of Human Services employee were present at the interview and that no one was present to assist in communicating with Blackstock. Pedigo also agreed that Blackstock did not know his social security number and that he misspelled his own last name on the waiver of rights form.

In addition, the evidence overwhelmingly demonstrated that Blackstock was mentally retarded and functioned on a level equivalent to a child from six to nine years of age. The evidence also showed that he could not read or write. Blackstock's conservator, Walter Grantham, testified that he treated Blackstock like a six or eight-year-old child, and in Grantham's opinion, Blackstock lacked the capacity to understand his constitutional rights. Dennis Barwick, the program director at the Orange Grove Mental Health Center, testified that Blackstock functioned at the level of a six-year-old child. Indeed, if Blackstock had the ability to meaningfully understand his rights, it is difficult to explain why he remained in jail for two weeks without making bond when his conservator was an attorney, and he had the funds to post bail.

In our view, the evidence preponderates against the trial court's determinations. For example, the trial court observed that Blackstock had a "mental impairment" and that he functioned "somewhat" at a lower level than other individuals. The evidence demonstrated, however, that Blackstock was mentally retarded, had an IQ of 55, and significantly impaired functioning equivalent to a child from six to nine years of age. Moreover, we note that the trial court stressed that "there's nothing to show that he did not understand what a lawyer was at that time, or that he didn't understand the fact that he had a right to representation by an attorney or lawyer or counsel or someone there to speak on his behalf." This effectively reversed the proper standard, which requires a showing that Blackstock had a meaningful awareness of his Miranda rights, as well as the consequences of waiving his rights. Stephenson, 878 S.W.2d at 544-45.

Accordingly, we conclude that the evidence in the record preponderates against the trial court's determination that Blackstock voluntarily, knowingly and intelligently waived the rights protected by the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. The lower courts therefore erred in failing to suppress the statement.

## INVOLUNTARY CARE AND TREATMENT

Prior to sentencing, Blackstock filed a petition for involuntary care and treatment as a mentally retarded offender pursuant to Tenn. Code Ann. § 33-5-301, et seq. (1984 & Supp. 1999). The trial court denied the petition because it had not been filed prior to trial and instead sentenced Blackstock to serve eight years in the Department of Correction.

The State maintains that the trial court properly determined that its authority to order commitment exists only before trial because the language of Tenn. Code Ann. § 33-5-305(a)(1)(B) (Supp. 1999) is predicated upon findings related to a defendant's competency to stand trial and also because the Department of Correction has its own authority to initiate proceedings for transferring an inmate to an appropriate facility for mentally retarded offenders. Tenn. Code Ann. § 33-3-402 (Supp. 1999). Blackstock argues, however, and the Court of Criminal Appeals agreed, that the trial court's authority exists before and after conviction because the definition of "mentally retarded offender" specifies he or she may be "<u>a defendant at any stage in the criminal or juvenile justice system</u>." Tenn. Code Ann. § 33-5-303(1) (1984) (emphasis added).

## Analysis

We begin our review of this issue with Tenn. Code Ann. § 33-5-303(1), which governs "mentally retarded offenders." A "mentally retarded offender" means a person with "significantly sub-average general intellectual functioning which originates during the developmental period and is associated with an impairment of adaptive behavior, <u>who is a defendant at any stage in the criminal or juvenile justice system</u>." Tenn. Code Ann. § 33-5-303(1) (emphasis added).

The procedures for requesting involuntary commitment are set forth in Tenn. Code Ann. § 33-5-305. The statute provides in part that if "a circuit, criminal, or general sessions court determines on the basis of an evaluation under § 33-7-301(a) either that a criminal defendant is incompetent to stand trial due to mental retardation or, with the agreement of defense counsel, that the defendant is competent to stand trial but that failure to provide a secure facility would create a likelihood to cause the defendant serious harm by reason of mental retardation" then the district attorney general or defense counsel "may file a complaint to require involuntary care and treatment of the mentally retarded person . . . ." Tenn. Code Ann. § 33-5-305(a)(1)(B), (a)(2).

A person may be "judicially committed to involuntary care and treatment," if the following are found: 1) the person is mentally retarded; 2) the person poses a substantial likelihood of serious harm as defined in § 33-6-104(c) because of the mental retardation; 3) the person needs care, training, or treatment because of the mental retardation; and 4) all available less drastic alternatives to judicial commitment are unsuitable to meet the needs of the person. Tenn. Code Ann. § 33-5-305(b).

An elementary principle of statutory construction requires that we ascertain and give effect to the legislature's intent without unduly restricting or expanding a statute's coverage beyond its intended scope. <u>State v. Pettus</u>, 986 S.W.2d 540, 544 (Tenn. 1999). The legislative intent and purpose are to be ascertained primarily from the natural and ordinary meaning of the statutory language, without a forced or subtle interpretation that would limit or extend the statute's application. <u>Id.</u>

Statutes relating to the same subject or sharing common purpose shall be read and construed together ("in <u>pari materia</u>") in order to advance their common purpose or intent. <u>Carver v. Citizen Utils. Co.</u>, 954 S.W.2d 34, 35 (Tenn. 1997). Our goal and function "is to adopt a reasonable

construction which avoids  statutory conflict and provides for harmonious operation of the laws."
Id.; see also Cronin v. Howe, 906 S.W.2d 910, 912 (Tenn. 1995).

Applying these principles of statutory construction, we note that the definition of "mentally retarded offender" specifically states that it applies to a defendant "at any stage in the criminal or juvenile justice system." Tenn. Code Ann. § 33-5-303(1). The plain language does not limit its application to defendants who have not been tried as the trial court concluded, but rather, extends throughout the process and includes sentencing. Although the procedures refer to the initial competency determination, it is illogical to infer that they apply only before trial. The statute authorizes "programs, especially community-based programs, for training, habilitating, or rehabilitating persons who are mentally retarded public offenders or delinquents under this part." Tenn. Code Ann. § 33-5-301 (1984). The legislative purpose is therefore to identify mentally retarded individuals in the criminal justice system and to provide alternatives to incarceration for those who require care, rehabilitation, and treatment. An interpretation that would limit the procedures to pretrial proceedings is inconsistent with this purpose.[5]

Moreover, as both lower courts observed, there is statutory authority for the director of a department of correction institution to transfer mentally retarded inmates to an appropriate treatment facility. Tenn. Code Ann. § 33-3-402 (Supp. 1999). If the State's argument were adopted, the statutes would allow commitment to be a viable consideration only before trial and after a defendant is physically transferred to the custody of the Department of Correction. This would render the commitment proceedings unavailable during a large portion of the proceedings – from trial, sentencing, post-trial proceedings, and potentially the appellate process. Again, this is inconsistent with the definition of "mentally retarded offender" and would frustrate the legislative purpose.

The Court of Criminal Appeals reached this same conclusion, yet concluded that Blackstock was not entitled to relief because the trial court lost jurisdiction over the sentence after Blackstock was physically transferred to the Department of Correction. While it is true that a trial court loses jurisdiction over the sentence after a defendant is in the custody of the Department of Correction pursuant to Tenn. Code Ann. § 40-35-212(d) (1997), this section does not prevent a reversal of the sentence and a remand for a new sentencing proceeding.

We have interpreted these statutory provisions in a manner that is consistent with the legislative intent and purpose and provides for the overall harmonious operation of the laws, and we therefore conclude that the trial court erred in refusing to consider Blackstock's petition for involuntary care and treatment as a mentally retarded offender.

## ESPECIALLY MITIGATED OFFENDER

---

[5] Such a limited interpretation is also inconsistent with statutory provisions allowing credit for time spent in the custody of the Department of Mental Health and Mental Retardation when the person receives evaluation, training or treatment "in connection with a criminal charge or conviction." Tenn. Code Ann. § 33-5-306 (1984).

Blackstock contends that the trial court erred in failing to impose a sentence as an especially mitigated offender. A court has the discretion to sentence a defendant as an especially mitigated offender if (1) he has no prior felony convictions and (2) the court finds mitigating but no enhancing factors in the record. Tenn. Code Ann. § 40-35-109(a)(1)-(2) (1997). If a court finds a defendant to be an especially mitigated offender, the court shall reduce the Range I minimum sentence by ten percent, reduce the release eligibility by twenty percent, or both. Tenn. Code Ann. § 40-35-109(b).

The trial court found that Blackstock had no prior felony convictions and that several mitigating factors were present, i.e., Blackstock's mental condition reduced his culpability and made it unlikely that he had a sustained intent to violate the law. Tenn. Code Ann. § 40-35-113(8), (11) (1997). The trial court denied especially mitigated sentencing, however, on the basis that an enhancement factor – that the victim was particularly vulnerable because of age or physical or mental limitations – was present in the record. See Tenn. Code Ann. § 40-35-114(4) (1997). The trial court instead sentenced Blackstock as a Range I, standard offender to the minimum of eight years in the Department of Correction. Tenn. Code Ann. § 40-35-112(a)(2) (1997).

The Court of Criminal Appeals correctly held that the trial court erred in finding the particular vulnerability enhancement factor because vulnerability cannot be presumed solely from the age of the victim and because there was no evidence that the victim was unable to resist, summon help, or testify at a later date. See State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993). The Court of Criminal Appeals nonetheless upheld the sentence after finding in the course of its de novo review that another enhancement factor – that the defendant abused a position of private trust – was established by the evidence. Tenn. Code Ann. § 40-35-114(15). We disagree.

## Analysis

In State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996), we held that the application of the abuse of trust factor requires a finding that a defendant occupied a position of trust, either public or private, and that the position of trust occupied was abused by the commission of the offense. We further explained:

> The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith.

Id. (emphasis added). Although we stressed that the "fact that an offender is older than the victim or that the offender is an adult and the victim is a child is insufficient without more to establish a position of trust," id. at 489, we have recently clarified that where "the adult perpetrator and minor victim are members of the same household, the adult occupies a position of 'presumptive private trust' with respect to the minor." State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999); State v. Carico, 968 S.W.2d 280, 286 (Tenn. 1998).

In the present case, the Court of Criminal Appeals concluded that Blackstock, through his relationship with the victim's mother and the victim, occupied a position that promoted the victim's confidence, reliability and faith in him, "such as would motivate her to approach and enter his apartment without fear." We initially note that the child and her family were no longer living in the same residence with Blackstock at the time of this offense. More importantly, we believe the Court of Criminal Appeals failed to take into account Blackstock's mental impairment as it related to the nature of the relationship between the child and him and whether the enhancement factor is applicable to these unique facts. Blackstock was mentally retarded with an IQ of 55. His functioning level was no greater than a child of nine years of age – hardly older than the victim. In these unique circumstances, we hold that the evidence is insufficient to apply this enhancement factor.

Accordingly, we find that no enhancement factors were proven to exist. Moreover, given the presence of Blackstock's mental limitations and low functioning as substantial mitigating factors, we find that the trial court erred in refusing to sentence Blackstock as an especially mitigated offender.

## CONCLUSION

In summary, we have concluded that the evidence does not preponderate against the trial court's finding that Blackstock was competent to stand trial but does preponderate against the trial court's determination that Blackstock voluntarily, knowingly and intelligently waived his Miranda rights before giving a statement. We have further concluded that the trial court erred in failing to consider Blackstock's petition for involuntary care and treatment as a mentally retarded offender and in refusing to sentence Blackstock as an especially mitigated offender. As a result, the conviction and sentences are reversed, and this case is remanded to the trial court for a new trial.

Having decided the legal issues, we have great concern about the judicial process in this case. This defendant was arrested in August of 1992, indicted in November of 1992, tried in June of 1993, and sentenced in September of 1993 to serve eight years in the Department of Correction. An appeal to the Court of Criminal Appeals was taken by notice of appeal filed on January 13, 1994. The case thereafter languished in the Court of Criminal Appeals for a period of almost four years until the release of an opinion in December of 1997. An appeal was sought in this Court in 1998. Disposition was again delayed by extensions sought by counsel for the State and by counsel for the defense.

Accordingly, this case stagnated in the appellate system for an unreasonable period of time, during which Blackstock was serving his sentence. In fact, counsel advised this Court at oral argument that Blackstock has now served his entire sentence. As a result of these appellate delays, a mentally retarded individual was tried, convicted, and incarcerated in the Department of Correction for his entire sentence without timely appellate review of significant issues. We have reversed the conviction and sentence, and the remedy is a new trial and sentencing. In this case, however, where the defendant has served his entire sentence, the prospect of a new trial is of dubious practical value and unlikely to be in the interest of the defendant, the victim, or the public as a whole. In short, the criminal justice system has failed in this case, and justice delayed has been justice denied. To avoid

-13-

such failures in the future, all courts must adopt and enforce rules and procedures which control and manage dockets to avoid unreasonable delay which saps public trust and confidence in the courts.

The judgment of the Court of Criminal Appeals is reversed, and the case is remanded to the trial court. Costs of appeal shall be paid by the State.