IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 10, 2013 Session

**STATE OF TENNESSEE v. ERICA LAWRENCE**

**Interlocutory Appeal from the Criminal Court for Shelby County**
**No. 10-06655     W. Otis Higgs, Jr., Judge**

**No. W2013-00549-CCA-R9-CD  - Filed January 24, 2014**

Defendant, Erica Lawrence, was indicted, along with her co-defendant Charles Bragg, by the Shelby County Grand Jury for first degree felony murder.  Defendant filed a motion to suppress a statement she gave to police in which she admitted that she was present during the murder but stated that her co-defendant committed the murder.  The trial court granted Defendant's motion to suppress, and the State filed an application for an interlocutory appeal, which this court granted.  After a thorough review of the record, we conclude that the evidence does not preponderate against the trial court's findings, and therefore, we affirm the decision of the trial court to grant Defendant's motion to suppress.

**Tenn. R. App. P. 9; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and D. KELLY THOMAS, JR., JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Goodman, Assistant District Attorney General, for the appellant, State of Tennessee.

Stephen C. Bush, District Public Defender; Barry W. Kuhn, Assistant Public Defender; and Dianne Thackery, Assistant Public Defender, Memphis, Tennessee, for the appellee, Erica Lawrence.

**OPINION**

*Suppression hearing*

The following testimony was presented at the hearing.

Sergeant Vivian Murray, of the Memphis Police Department, interviewed Defendant on September 3, 2010, in connection with the investigation of the murder of the victim in this case. Sergeant Murray testified that Defendant was advised of her *Miranda* rights, *Miranda v. Arizona*, 384 U.S. 436 (1966) and signed a waiver form. Sergeant Murray testified that Defendant appeared to have understood her rights, and Sergeant Murray did not have any difficulty communicating with Defendant. Defendant told Sergeant Murray that she had completed eleventh grade and that she had not ingested any drugs or alcohol within the 24 hours prior to the interview. Sergeant Murray noted on the waiver form that Defendant read her rights aloud. Sergeant Murray testified that it took approximately three minutes to advise Defendant of her *Miranda* rights and obtain Defendant's signature on the waiver form. Sergeant Murray testified that Defendant was shackled to a chair during the interview. The interview was not recorded.

Sergeant James Max was also present when Defendant waived her *Miranda* rights at 10:05 a.m. Sergeant Max also testified that Defendant read the waiver of rights aloud and acknowledged that she understood it. Defendant identified her co-defendant, Charles Bragg, in a photographic lineup and wrote: "This him [crossed through] This Charles the guy dat [sic] shot Randy. [Defendant's signature] 9-3-10 10:144 am[.]"

Detectives interviewed Defendant from 10:08 a.m. until 1:30 p.m., when Sergeant Murray left the interview. The detectives took a break from 1:30 until 2:15 p.m. Sergeant Max testified that they took other breaks, and Defendant ate lunch. Between 2:16 and 4:36 p.m., Defendant gave a statement, which was transcribed, and Defendant initialed each page of the typewritten statement. Sergeant Max testified that Defendant was pregnant at the time of the interview. Sergeant Max testified that Defendant read the statement to herself and signed and dated it. Sergeant Max testified that Defendant gave the statement after she had been placed on a "forty-eight hour hold" and before an arrest warrant was obtained.

Sergeant Eric Freeman, the case coordinator of the investigation, testified that Defendant became a person of interest in the case after a witness reported that he had seen a pregnant female going through the victim's pockets. This pregnant female was also driving a light colored Ford Taurus. The same witness identified Defendant in a photographic lineup. The shooting occurred on September 1, 2010, and Defendant's cousin told detectives that Defendant always drove the victim around on the first day of the month because the victim received a check at that time and Defendant would try to get money from him. On the night of September 2, 2010, Defendant went to the police station voluntarily because she had heard that police were looking for her. Sergeant Freeman advised police to "put her on the hold for us until we came in the next morning to talk to her." On cross-examination, Sergeant Freeman testified that Defendant was taken into custody without an arrest warrant because "there was enough probable cause for her to be arrested at that time."

Dr. Wyatt Nichols, a clinical psychologist, testified for the defense. Pursuant to a court order, Dr. Nichols evaluated Defendant's mental competency to stand trial and her competency to waive her *Miranda* rights. Dr. Nichols interviewed Defendant on April 19, July 12, and July 14, 2012. Dr. Nichols reviewed Defendant's school records, which showed that Defendant was tested for special education at the age of 15 and had an IQ of 55. At that time, Defendant's reading and language skills were assessed at a third grade level. Defendant was also evaluated in 2007 for employment purposes and had an IQ of 50. Defendant was noted to have difficulty with memory, and the examiner noted that Defendant "was markedly impaired in her ability to even do simple tasks without very direct supervision and definitely could not follow through with anything that would be considered a complex task." The examiner also testified that Defendant was not able to ride the bus, be left alone for any length of time, or take care of her own personal hygiene. The report that Dr. Nichols reviewed also stated that Defendant was born to a cocaine-addicted mother, and she lived with her aunt.

Defendant was twenty-five years old at the time of Dr. Nichols' evaluation. She reported her age to Dr. Nichols as "a 2 and a 5." Dr. Nichols described Defendant as "very simple" and testified that she "rarely said more than a sentence of about five or six words." Defendant's IQ was tested by Dr. Tucker Johnson for the court-ordered evaluation and Dr. Johnson determined that it was "in the high 50's[,] low 60's."

Dr. Nichols testified that the examiners for each of Defendant's prior evaluations noted concern that Defendant might not have put forth her best effort. When Defendant was tested at age 15, the examiner noted that she had been in a school fight the day before, and it might have affected how much effort she put forth. Dr. Nichols testified that the examiner for the 2007 evaluation noted that "she was surprised at how low the IQ was and she felt that [Defendant] might function at a little bit higher level than that." Dr. Johnson also expressed doubt as to how much effort Defendant put forth in the evaluation. Dr. Nichols testified that "it just seems like she's not trying, she's not trying. But to have three consistent testings at 15, 20 and now 25 and her IQ's are almost the same, she couldn't do that if she tried unless those were about where she's functioning." Dr. Nichols opined that Defendant's IQ was "about 60 or so." Dr. Nichols testified that an IQ score between 50 and 70 indicates that a person is mildly mentally retarded.

Dr. Nichols had Defendant read the advice of rights form aloud. Dr. Nichols testified that Defendant read the first sentence, "you have the right to remain silent" as "you have the right to a lawyer." Dr. Nichols testified that he believed that Defendant read only the first part of the sentence and then repeated a phrase that was familiar to her. Dr. Nichols asked Defendant what an attorney is, and Defendant responded, "it's that lady . . . . the one that talks to [her] in court." Dr. Nichols asked Defendant about the right to remain silent, and

Defendant's only response was "shh, shh." Dr. Nichols testified that Defendant never explained what it means to have the right to remain silent. Defendant acknowledged that she understood that her statement could be used against her in court, but she stated "if I don't talk to them, they'll take me to jail." Dr. Nichols testified that he believed that Defendant thought she had no choice of whether to talk to police and "that's consistent with somebody who is as low function as she is with authority figures."

Dr. Nichols testified that it was his opinion that Defendant did not understand the *Miranda* warnings sufficiently to waive them. When Dr. Nichols interviewed Defendant in April, he observed that "she could of [sic] been malingering." He testified that Defendant hesitated when answering his questions. After reviewing Defendant's school records and testing and meeting with her again, Dr. Nichols observed, "I think she could put forth more effort if she really wanted to [ ] answer people's questions but I don't think it's malingering." Dr. Nichols testified that Defendant's "intellectual level is in the mental retardation range." He testified that he believed Defendant might have suffered brain damage as a result of her mother having used cocaine at the time of Defendant's birth. Dr. Nichols testified, "[Defendant] could be very impaired in one area and have skills at a higher level in another area according to what areas of her brain were [a]ffected by the chemicals that her mom was using."

When Dr. Nichols asked Defendant to sign a release for her school records, Defendant did not understand. Dr. Nichols testified, "I don't know how many times I asked her and tried to explain it to her and all she would say was I'm not there anymore, I'm not in school anymore." Dr. Nichols noted during his first meeting with Defendant that it was his opinion that Defendant "did not understand her *Miranda* rights at the time of her police interrogation." He testified,

> [t]he only way she could [have] come close to understanding her rights was if the officers painstakingly and methodically went over each statement in the warning, explained it to her and then had her repeat what they had said. And then after finishing the whole statement ask her to say, say the whole statement in her own words and see if she understood it and how it applied to her.

In rebuttal, the State called Dr. John Hutson, a clinical psychologist. Dr. Hutson interviewed Defendant. Dr. Hutson did not state an opinion as to Defendant's ability to competently waive her Miranda rights but rather concluded that "it's the judge's decision." Dr. Hutson testified that he believed that Defendant understood her rights to have an attorney present and to remain silent. Dr. Hutson noted that Defendant had been in traffic court and seen attorneys in that context. He testified that Defendant "gave a good understanding of

-4-

what an attorney is supposed to do" and that Defendant "did have some appreciation as a lay person that an attorney was available on her behalf." He also noted that, in her statement, Defendant acknowledged that her co-defendant told her not to talk to police. Dr. Hutson testified, "I think she knew she had the right to not talk [sic] if she didn't want to." Dr. Hutson testified, however, that Defendant was illiterate, meaning that she could not read and comprehend. He testified that he believed Defendant "made an honest effort." Dr. Hutson testified that he believed it would have taken Defendant "a long time" to read the advice of rights form aloud and that she could not have comprehended it.

The State recalled Dr. Nichols at a continuation of the suppression hearing on a later date. Dr. Nichols testified that since his previous testimony at the suppression hearing, he had been provided with "a couple dozen" recorded phone conversations Defendant had while incarcerated. Dr. Nichols testified "it was apparent . . . that she functioned at a little higher level than what she presented" to Dr. Nichols and that "she was not putting forth [her] best effort" previously. Dr. Nichols testified that he consequently changed his opinion to inconclusive. He testified that Defendant "did not put forth enough effort for [him] to honestly and accurately evaluate her level of functioning." On cross-examination, Dr. Nichols could not point to any particular content of the phone conversations that caused him to change his opinion, but he testified, "it was obvious that she was more engaged and more interactive and just the idea that it was clearly that she was different than the person I had talked to as far as how much effort she was putting into answering my questions." Dr. Nichols testified that Defendant "was more verbal and interactive and could answer questions," whereas in his interview with her, Defendant gave "one[-]word answers."

In a written order granting Defendant's motion to suppress, the trial court found that Defendant "could not have voluntarily, knowingly, and intelligently waived her *Miranda* rights because of her mental retardation, thereby making her statement inadmissible." In making its ruling, the trial court relied upon evidence of Defendant's low IQ, as well as Dr. Nichols' initial testimony that Defendant could not have read the advice of rights form aloud and comprehended it and Dr. Hutson's testimony that Defendant would not have been able to read and comprehend the advice of rights form. The trial court noted that "Defendant read the Miranda rights to herself and then [Sergeant Murray] proceeded to read them out loud to the Defendant."

*Analysis*

The State sought an interlocutory appeal, challenging the trial court's ruling on the motion to suppress. On appeal, the State asserts that the trial court made an erroneous finding that Defendant read the advice of rights form to herself, rather than aloud, and that the evidence preponderates against the trial court's findings because the trial court

"completely disregarded Dr. Nichols' subsequent testimony in which he withdrew his earlier opinion."

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews de novo the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S .W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23.

The Fifth Amendment to the United States Constitution provides in part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions," the accused "shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. An accused, however, may waive this right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In *Miranda*, the United States Supreme Court held that a suspect must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. *Id*. at 479. The Supreme Court held that a suspect may knowingly and intelligently waive the right against self-incrimination only after being apprised of these rights. *Id*. Accordingly, for a waiver of the right against self-incrimination to be held constitutional, the accused must make an intelligent, knowing, and voluntary waiver of the rights afforded by *Miranda*. *Id*. at 444. A court may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver. *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994).

The fact that a person suffers from certain mental deficiencies does not necessarily prevent that person from understanding and waiving constitutional rights. *See generally State v. Middlebrooks*, 840 S.W.2d 317, 327 (Tenn. 1992); 4 Wharton's Criminal Evidence § 643 (14th ed.1987). A person with a mental deficiency may waive his *Miranda* rights if

that waiver was knowingly and voluntarily made. *State v. Green*, 613 S.W.2d 229, 233 (Tenn. Crim. App. 1980); *Braziel v. State*, 529 S.W.2d 501, 505-06 (Tenn. Crim. App. 1975). When determining whether an accused has voluntarily, knowingly, and intelligently waived his *Miranda* rights, this Court must consider the totality of the circumstances which existed when the accused waived these rights. *Middlebrooks*, 840 S.W.2d at 326; *State v. Benton*, 759 S.W.2d 427, 431 (Tenn. Crim. App. 1988). The "totality of the circumstances must reveal 'an uncoerced choice and the required level of comprehension.'" *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn.2000) (quoting *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)).

A defendant's mental retardation is but one of a number of different factors to be considered in the determination of whether the waiver of *Miranda* rights was knowing and voluntary. In *Blackstock*, 19 S.W.3d at 208, our supreme court observed:

> Although there is likely to be a level of deficiency so great that it renders a defendant unable to make a knowing and intelligent waiver, nearly every court to consider the issue has held that mental impairments or mental retardation are factors that must be considered along with the totality of the circumstances. As one court has said, "no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving, and do [sic] so waive, the constitutional rights embraced in the *Miranda* rubric." *Fairchild v. Lockhart*, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989). Among the circumstances courts have considered are the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the *Miranda* rights are explained. As a result, courts tend to reach results that are somewhat fact-specific.

*Id*. (footnote omitted). The State has the burden of proving the waiver by a preponderance of the evidence. *State v. Bush*, 942 S.W.2d 489, 500 (Tenn. 1997).

In its order granting Defendant's motion to suppress, the trial court likened the facts of this case to those in *Blackstock*, 19 S.W.3d 200 (Tenn. 2000), finding that Defendant's IQ was assessed at three separate times, to be between 50 and 60, putting her in the range of mildly mentally retarded. The trial court also noted that Defendant was found to be illiterate. The Defendant in *Blackstock* could not read or write, had an IQ of 55, and functioned at the level of a child of six to nine years of age. *Id*. at 209. In *Blackstock*, the arresting officer read the *Miranda* rights to the defendant, explained them in "plain language," and believed

the defendant understood that he was waiving his rights by signing a waiver form. *Id*. at 207. In this case, the trial court's order states that "the interviewing officer had the Defendant read the *Miranda* rights to herself and then the officer proceeded to read them out loud to the Defendant." The State points out that this finding by the trial court is mistaken, as both Sergeant Murray and Sergeant Max testified that Defendant read the *Miranda* rights aloud. While we agree with the State that testimony at the suppression hearing was that Defendant read the advice of rights form aloud, the trial court as the finder of fact did not have to find this testimony credible.

The trial court relied primarily upon Dr. Nichols' testimony that Defendant did not understand her rights and that

> The only way [Defendant] could [have] come close to understanding her rights was if the officers painstakingly and methodically went over each statement in the warning, explained it to her and then had her repeat what they had said. And then after finishing the whole statement ask her to say, say the whole statement in her own words and see if she understood it and how it applied to her.

The trial court also relied upon Dr. Hutson's testimony that Defendant could not have comprehended her *Miranda* rights. The trial court's order does not, however, cite the testimony of Dr. Nichols that, after listening to several recorded jail phone calls, he changed his opinion to "inconclusive" because he believed that Defendant had not put forth her best effort during his evaluation of Defendant. The State argues, therefore, that the evidence preponderates against the trial court's findings. We note that the record does not indicate that the State sought clarification from the trial court or an amended order making findings that the trial court considered and accepted or rejected Dr. Nichols' second opinion. We conclude that the trial court implicitly rejected Dr. Nichols' subsequent testimony. The trial court accepted Dr. Nichols' initial testimony and the testimony of Dr. Hutson. In his initial testimony, Dr. Nichols noted, as prior examiners also observed, that Defendant could have put forth more effort in the evaluation, but he found that she was not malingering. After having listened to Defendant's recorded jail phone conversations, Dr. Nichols' opinion in that regard did not change. He did not testify that he believed Defendant was malingering. Moreover, Dr. Nichols' initial opinion was based on prior evaluations, reports, and Defendant's school records, which also did not change or cause Dr. Nichols to alter his opinion. His opinion changed based solely on phone conversations between Defendant and her family members from jail. The recordings of those phone calls were not presented as evidence at the suppression hearing.

As a general rule, the trier of fact, in this case the trial court, is free to accept portions of a witness's testimony and reject other portions. *See State v. Adams*, 45 S.W.3d 46, 56 (Tenn. Crim. App. 2000). Regarding perceived inconsistencies in the evidence, we are bound by the axiom that we do not resolve credibility issues, draw our own inferences from the facts, or usurp the trial court's domain by re-adjudicating factual determinations. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Our task is merely to determine whether the evidence, viewed in the light most favorable to Defendant as the prevailing party in this case and without considering credibility issues or factual disputes, supports the ruling of the trial court. In this case, we conclude that the evidence does not preponderate against the trial court's finding that Defendant could not have voluntarily, knowingly, and intelligently waived her rights because she was intellectually disabled.

Accordingly, the judgment of the trial court is affirmed.

Defendant raises a second issue on appeal. Defendant also contends that her statement should have been suppressed based on detectives' unreasonable and unnecessary delay in seeking a probable cause determination. Although Defendant raised this issue in her "Supplemental Motion to Suppress Defendant Statement," the issue was not addressed by the trial court in its order granting the motion to suppress Defendant's statement. Furthermore, the issue was not included in the State's application for permission to file a Rule 9 interlocutory appeal or the trial court's order granting permission to file an interlocutory appeal. The State argues that the issue is therefore not properly before this court. We agree with the State.

Under Rule 9 of the Tennessee Rules of Appellate Procedure, the issues in a Rule 9 interlocutory appeal are limited to the questions that are certified by the trial court in its order granting permission for the appeal and also certified by the appellate court in its order granting permission for the appeal. *In re Bridgestone/Firestone*, 286 S.W.3d 898, 902 (Tenn. Ct. App. 2008) (citing *Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W.3d 911, 914 (Tenn. Ct. App. 2000)). The questions on appeal are subject to a further limitation. In an interlocutory appeal, as well as in an appeal as of right, the appellate court considers only questions that were actually adjudicated by the trial court. *In re Estate of Boykin*, 295 S.W.3d 632, 636 (Tenn. Ct. App.2008) ("At the appellate level, 'we are limited in authority to the adjudication of issues that are presented and decided in the trial courts. . . .'") (quoting *Dorrier v. Dark*, 537 S.W.2d 888, 890 (Tenn. 1976)). To do otherwise would render the interlocutory appeal a request for an advisory opinion. In the case at bar, the issue is asserted in Defendant's supplemental motion to suppress her statement, and defense counsel elicited testimony from at least one of the officers regarding the issue at the suppression hearing. However, from our review of the order and the hearing transcript, the trial court did not rule

on this issue.  Rather, the trial court's order contained only a determination of whether Defendant's statement was voluntarily given based on her inability to waive her *Miranda* rights. Under these circumstances, we respectfully decline to address Defendant's second issue.


_____

THOMAS T. WOODALL, JUDGE