IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 27, 2001

## STATE OF TENNESSEE v. JASON HAMILTON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-A-361     Steve Dozier, Judge**

---

**No. M2001-00348-CCA-R3-CD - Filed October 21, 2002**

---

The defendant, Jason Hamilton, was convicted of first degree felony murder, second degree murder, and attempted aggravated robbery. The victim was named Thomas Spivey. The trial court merged the two murder convictions and sentenced the defendant to serve life in prison for the merged conviction. For his attempted aggravated robbery conviction, the trial court ordered the defendant to serve a four-year sentence concurrently with his life sentence. The defendant now appeals those convictions, arguing that the trial court erred by denying his motion to suppress his self-incriminating statement and that the evidence is insufficient to support his convictions. After reviewing the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the appellant, Jason Hamilton.

Paul G. Summers, Attorney General & Reporter; Kim R. Helper, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Brian Holmgren, Assistant District Attorney General for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

Late on October 11, 1999, Sean McIntyre called 911 to alert the police after he had driven the body of Thomas Spivey away from its original location, outside Reginald Nevels's house. Nevels admitted that he paid MacIntyre to transport the body because Nevels was afraid that the body's location outside his home would raise police suspicions. The murder weapon, a gun, was eventually found under a bush two houses away from Nevels's home. Apparently, the defendant

lived with Nevels and Nevels's wife, Katrina, and sold drugs for Nevels in exchange for room, board, and drugs.

There were three witnesses to the victim's murder, Fred Davis, Carlos Mayberry, and Shamus Peebles, and all three identified the defendant as the killer. On the day of the murder, Shamus Peebles, accompanied by his friend Darren, went to Nevels's home to feed his dogs that he had been keeping there. According to Peebles, Nevels, as well as the defendant and two other men, were present at the house when Peebles arrived. However, Nevels later left with Darren to run an errand. Sometime after Nevels had left, the victim arrived at Nevels's house, spoke with the defendant, and then left to collect some drugs at the defendant's request. While Peebles did not hear the defendant's initial conversation with the victim, he did hear the defendant tell the others who were present in the house that the victim was planning on returning to the house with marijuana. The victim returned to Nevels's house approximately 30 minutes after he left to run his errand, and Darren and Nevels returned at the same time. Peebles immediately got into Darren's car because he wanted to leave the house in order to avoid any involvement in the victim's robbery. As Peebles and Darren drove away, Peebles heard someone order someone else to "set it out," which he explained is a common street term used in robberies. Peebles also heard a gunshot.

Carlos Mayberry testified that he was standing outside on the street when the victim returned to Nevels's house. According to Mayberry, the defendant was originally standing outside with Mayberry and others in an alley next to Nevels's house when the victim returned. Once the victim returned, the defendant went back inside Nevels's house for five minutes. When the defendant came back outside, he walked up to the victim, who was standing outside his car, and asked him "where the weed is at?" Mayberry next heard the defendant ask the victim to "[g]ive [him] the weed" and to "set it out." The defendant then pulled out his gun and shot the victim. After the defendant shot the victim, Mayberry ran away.

Fred Davis was with Mayberry on the night of the murder. Davis testified that he saw the defendant shoot the victim, as well. However, he did not remember the defendant saying anything before he shot the victim.

The defendant testified that on the day of the murder, the victim came to Nevels's home to speak with the defendant about the defendant selling marijuana for him. During this conversation, Nevels returned to his house and became outraged when he learned that the victim had marijuana in his home, as his home had been the subject of many recent raids. Nevels flew into a rage and demanded that the victim leave, but the victim refused. Nevels then shot the victim and fled. Nevels called the defendant later that evening and told him that he was in debt to Nevels for living in his house and that if he confessed to the crime, Nevels would pay for his attorney and make the shooting look like an accident. Accordingly, the defendant turned himself into the police and delivered a full confession. However, once the defendant learned that Nevels did not intend to honor his promise, the defendant attempted to recant his confession.

A police officer testified for the defense, stating that he had searched Nevels's home on several occasions and had recovered drugs and weapons there. He also testified that as an undercover agent, he had bought drugs from both Nevels and his wife. Additionally, Carrie Parman, the defendant's girlfriend, testified that after the shooting, she overheard Nevels telling his wife not to worry because the defendant was going to "take care of everything." Nevels denied making this statement and stated that he had never spoken to the victim and did not know him. He further

claimed that he was inside his house when the victim was shot and that he paid someone to move the victim's body away from his house in an attempt to avoid becoming the subject of police scrutiny.

The medical examiner who examined the victim testified that the victim had been shot in his left arm. He explained that the bullet damaged the victim's heart and lungs, which resulted in internal bleeding and ultimately the victim's death.

After hearing this evidence, the jury subsequently convicted the defendant of first degree felony murder, second degree murder, and attempted aggravated robbery. As aforementioned, the trial court merged the first two counts and ordered the defendant to serve a life sentence for his murder convictions concurrently with his four-year sentence for attempted aggravated robbery. The defendant now appeals his convictions, arguing that the trial court erred by refusing to grant his motion to suppress his confession and that the evidence is insufficient to support his convictions. After reviewing the record, we find that none of the defendant's allegations merit relief.

## Suppression of Defendant's Statement

As aforementioned, the defendant challenges the trial court's denial of his motion to suppress his statement. Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews de novo the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999).

The defendant argues that the trial court erroneously denied his motion to suppress the allegedly involuntary incriminating statement that he made to the police. The Fifth Amendment to the United States Constitution provides in part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. However, an accused may waive this right against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966). In Miranda, the United States Supreme Court held that a suspect must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Miranda, 384 U.S. at 479. The Supreme Court held that a suspect may knowingly and intelligently waive the right against self-incrimination only after being apprised of these rights. Id. Accordingly, for a waiver of the right against self-incrimination to be held constitutional, the accused must make an intelligent, knowing, and voluntary waiver of the rights afforded by Miranda. Id. at 444. A court

may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver. State v. Stephenson, 878 S.W.2d 530, 545 (Tenn. 1994).

The defendant contends that his age at the time he gave his confession, his lack of education, his learning disabilities, his inexperience with the adult criminal system, and his history of drug abuse resulted "in the Defendant's will being overborne by investigating officers." Indeed, the record indicates that the defendant was eighteen-years-old at the time he made the incriminating statement; he has only completed the seventh grade; he has an attention deficit disorder and an IQ of 73; he has a juvenile record, but had not yet developed an adult criminal record; and he habitually used cocaine and marijuana and had been smoking marijuana on the day he gave his statement to the police.

When the defendant brought his motion to suppress, he challenged the voluntariness of his statement on the grounds enumerated above. However, in its order denying the defendant's motion, the trial court only specifically addressed the effect of the defendant's alleged intoxication. The order indicates that the trial court examined the totality of the circumstances surrounding the defendant's interview and found that the police properly advised the defendant of his Miranda warnings and that the defendant made a knowing and voluntary waiver of those rights before making his statement to the police. Specifically, the trial court rejected the defendant's allegation that his statement was involuntarily made because he was under the influence of drugs, noting that the defendant's alleged marijuana use occurred eight hours before his interview. The court also accredited the testimony of the police detective who interviewed the defendant. The detective testified that he asked the defendant whether he was intoxicated before proceeding with the defendant's interview, and the defendant answered that he was not. The detective further testified that he read the defendant his Miranda warnings and that the defendant stated that he understood his rights and the consequences of waiving those rights. Moreover, the videotape of the defendant's interview corroborates these findings.

We find that the trial court correctly found that the defendant did not "establish that [his] statement cannot be considered the product of a free mind and rational intellect" due to his allegedly intoxicated condition when he made the statement. See State v. Ross, No. 03C01-9404-CR-00153, 1996 Tenn. Crim. App. LEXIS 505, at *10 (Tenn. Crim. App. at Knoxville, Aug. 15, 1996) (stating that "[i]ntoxication or mental unsoundness does not render a confession invalid, if the evidence shows that the confessor was capable of understanding and waiving his or her rights" and citing State v. Bell, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985) and State v. Green, 613 S.W.2d 229, 233 (Tenn. Crim. App. 1980)). As the trial court noted, the testimony of the interviewing detective and the videotape of the defendant's interview all indicate that the defendant was cognizant of his actions, as well as alert and responsive during his interview. Thus, the trial court properly denied the defendant's motion on that ground.

We now turn to the other characteristics that the defendant alleges prevented him from voluntarily waiving his rights against self-incrimination. The defendant alleges that his age, lack of formal education, and lack of experience with the adult criminal justice system were all factors that negated his ability to voluntarily waive those rights. In State v. Kelly, 603 S.W.2d 726 (Tenn. 1980), our supreme court considered a factually analogous scenario in which a defendant was appealing a trial court's denial of his motion to suppress a self-incriminating statement. Id. at 728-

29. Kelly alleged that his confession was not voluntarily made, but rather was made due to promises of leniency from the interviewing police officer. Id. The supreme court found that the evidence did not preponderate against the trial court's denial. Id. When evaluating the totality of the circumstances surrounding the defendant's waiver, the trial court considered the defendant's hour-long detention before being interviewed, his age of 18, his eighth grade education, his prior experience with the criminal justice system as a juvenile, and the fact that "there was no indication that he was other than calm and in full control of his emotions and reasoning powers." Id. at 729.

As noted supra, the defendant in the instant case was similarly 18-years-old at the time of his interview, has a seventh grade education as opposed to an eighth grade education, has a juvenile criminal record more extensive than Kelly's juvenile record, and was detained for approximately five hours before being interviewed, a result of the fact that he turned himself in at the police station of an adjoining county. Moreover, as the trial court found, "the defendant was coherent, alert, and answered [the detective's] questions without any difficulty." Thus, there was, as in Kelley no indication that the defendant was "other than calm and in full control of his emotions and reasoning powers." Id. Considering this precedent, we cannot say that any of these factors are dispositive of the defendant's inability to make a voluntary waiver of his rights against self-incrimination.

Moreover, we find that while the record reflects that defendant has an IQ of 73 and a learning disability, he appeared to have understood the Miranda warnings, which were read to him and waived by him twice, and he was able to intelligently relate the events of the victim's murder. In State v. Blackstock, 19 S.W.3d 200 (Tenn. 2000), our supreme court reversed a conviction of a defendant with an IQ of 55 because he was obviously mentally retarded and unable to make an intelligent waiver of his rights. See id. at 208-09. However, in the instant case, the record does not indicate that the defendant was comparably impaired. He testified on his own behalf at trial, and again seemed to be capable of responding intelligently to both the defense and prosecuting attorneys.

In conclusion, considering the totality of the circumstances as discussed above, we find that the trial court correctly determined that the defendant was capable of making voluntary, knowing, and intelligent waivers of his rights against self-incrimination. Indeed, by his own admission at trial, the defendant was fully aware of the consequences of his self-incriminating statement, as he testified that he decided to incriminate himself at Nevels's request. Thus, this issue lacks merit.

## Sufficiency

The defendant alleges that the evidence introduced at trial is insufficient to support his convictions for first degree felony murder, second degree murder, and attempted aggravated kidnapping. When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" state's witnesses and resolves all conflicts in the testimony in favor of the state. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence.

Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the state "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Tilson, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

As noted above, the defendant was convicted of felony murder, which is a form of first degree murder that is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2). The crime supporting the defendant's felony murder conviction was attempted aggravated robbery. Tennessee Code Annotated section 39-13-401 defines robbery as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Aggravated robbery is "robbery as defined in § 39-13-401 . . . accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon . . . [or w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-402(a). The defendant was also convicted of second-degree murder, which is defined as "a knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1).

The defendant alleges that the evidence is insufficient to support his murder convictions and his attempted aggravated robbery conviction because there was ample evidence allowing the jury to conclude that the eyewitnesses to the crime were lying. However, we find that the defendant's contention that these witnesses were incredible lacks merit. The jury, not this court, resolves questions concerning the credibility of witnesses. See State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995).

Combining the testimonies of the witnesses to the crime, these individuals recounted that the defendant made plans to rob Mr. Spivey before Mr. Spivey returned to Nevels's house with his drugs and that once the victim did return to Nevels's house, the defendant ordered the victim to "set [his drugs] out," a common street term used during robberies. Two of the witnesses testified that they then saw the defendant shoot the victim. The medical examiner testified that the victim died as a result of that shot. The defendant's self-incriminating statement, which the jury considered, corroborated these events. In that statement, the defendant told police that he planned to rob the victim at gunpoint and then shot him during the commission of that robbery. Based on this evidence, we find that a jury could have reasonably concluded that the defendant killed the victim while attempting to rob him. Because we find that the evidence is sufficient to support the defendant's felony murder conviction, this conclusion pretermits our review of the defendant's conviction for the lesser offense of second degree murder. Thus, we conclude that the defendant's sufficiency challenge lacks merit.

## Conclusion

For the foregoing reasons, we find that none of the defendant's allegations merit relief. Accordingly, the judgment of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE