# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 9, 2002 Session

## STATE OF TENNESSEE v. ANN MARIE THORNTON KELLY

**Direct Appeal from the Circuit Court for Giles County**
**No. 8644-7    Robert L. Jones, Judge**
**Jim T. Hamilton, Judge**

---

**No. M2001-01054-CCA-R3-CD - Filed December 5, 2002**

---

The appellant, Ann Marie Thornton Kelly, was indicted by the Giles County Grand Jury on twenty counts relating to incidents involving the sexual abuse of her children. She was ultimately convicted of two counts of rape of a child, three counts of criminal responsibility for rape of a child, one count of aggravated sexual battery, one count of criminal responsibility for aggravated sexual battery, and one count of incest. The trial court imposed a total effective sentence of sixty-two years incarceration in the Tennessee Department of Correction. On appeal, the State concedes that the appellant was not competent to stand trial. Upon review of the record and the parties' briefs, we reverse the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Reversed and Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOE G. RILEY and ALAN E. GLENN, JJ., joined.

Hershell Koger, Pulaski, Tennessee, for the appellant, Ann Marie Thornton Kelly.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; Mike Bottoms, District Attorney General; and Richard Dunavant, Patrick Butler, and Cindi Johnson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Factual Background

The following facts underlie the charges against the appellant. The appellant married Otis Thornton in the early 1980's, and together they had four children,[1] a daughter,  PMT, and three

---

[1] The appellant has two older children who are adults and did not live with the appellant at the time of these offenses.

sons, BJT, RGT, and RT.[2]  Thornton was the primary caregiver of the children; however, he died on September 6, 1997.  Subsequently, the appellant and her four children moved to a mobile home in the Town and Country Trailer Park in Pulaski.  The environment in the home deteriorated rapidly after Thornton died.  Although the Department of Children's Services (DCS) had regularly received referrals regarding the family beginning in approximately 1984, the reports increased after Thornton's death.[3]  However, no attempt was made to remove the children from the home.

Soon after moving into the Town and Country Trailer Park, the appellant began a relationship with Cayle Wayne Harris.  Harris visited the home daily and often stayed overnight.  As a result of allegations of sexual abuse involving the appellant's children, Michael Chapman, chief investigator for the Giles County Sheriff's Department, interviewed the appellant's twelve-year-old daughter, PMT, on December 2, 1997.  Investigator Chapman again interviewed PMT on June 23, 1998.  BJT, the appellant's ten-year-old son, and RGT, the appellant's eight-year-old son, were interviewed in May and July 1998.  The appellant's youngest child, RT, who was three years old, was too young to provide any information to Investigator Chapman.

During his investigation, Investigator Chapman also interviewed the appellant on June 19, 1998.  Investigator Chapman testified that the appellant "had been contacted and agreed to meet us at the Lawrence County Courthouse . . . at, I think, nine o'clock."  The appellant was not at the courthouse at the appointed time.  Investigator Chapman went to the appellant's house and discovered that "she had been there earlier than nine o'clock, thought that we were not going to show up and gone back home.  So then she agreed from her home, when we spoke to her at home to come back to the courthouse and talk to us."  Accordingly, the appellant's husband, Calvin Kelly, drove the appellant to the courthouse where she was interviewed by Investigator Chapman; Tommy Workman, an investigator with the District Attorney's office; and Candice Deason, an investigator with DCS.  The interview was held in the judge's chambers, a small room located just off the courtroom, and was audio tape-recorded.  Investigator Chapman began the interview by telling the appellant that "Wayne Harris did some things with your boys."  Investigator Chapman informed the appellant that he had spoken with her sons and had reason to believe that the appellant had witnessed Harris having sex with her children.  Initially, the appellant denied any knowledge of the incidents, stating that she believed the interviewers were referring to "Chi[gg]er Harris."  However, after Investigator Chapman again explained that they were asking about incidents involving Cayle Wayne Harris, the appellant immediately admitted that she witnessed Harris having sex with her sons, stating that "he was low down and stupid doing that away. . . . And that really hurt me."  When asked if she feared Harris, the appellant responded, "Yea.  He's even offered to threaten me here I don't know how many times since I lived that trailer park at Pulaski.  He's even offered to threaten me, said he was going to kill me; he's going to shoot me; he's going to cut me."  The appellant stated that because she was afraid of Harris, she did not attempt to stop his abuse of her children.

---

[2] It is the policy of this court to refer to minor victims of sexual crimes by their initials.

[3] Prior to 1997, the Department of Human Services (DHS) investigated cases involving child abuse.  However, in 1997, DCS was created as a separate department to focus solely on cases regarding the welfare of children.

The appellant proceeded to describe an incident wherein she and her three-year-old son, RT, were lying in her bed. Harris, who was intoxicated, came into the room and anally raped the child. The appellant explained, "I wasn't on the bed but one time and that was that night when I was trying to go to sleep and couldn't go to sleep cause he was having sex you know . . . with the baby, cause the bed just shake and shake and I am trying to go to sleep and couldn't go to sleep for that." When asked how many times Harris had "do[ne] it with the baby," the appellant responded "Oh, about one or two times." Each time, the child screamed and cried.[4]

The appellant admitted that she was aware Harris had sex with all four children. Specifically, the appellant related that BJT, who was ten years old at the time of the offenses, was repeatedly anally raped by Harris. However, the appellant was unable to conclusively recall the exact number of times this occurred. Initially, the appellant stated that Harris had raped BJT three times, but after prompting from Investigator Chapman, the appellant stated that BJT had been raped by Harris on six occasions. The appellant concluded by saying that Harris raped BJT four times. When asked where these offenses occurred, the appellant responded, "In there in my bedroom every time, in there in my bedroom." The appellant admitted that she was also in the bed, noting, "But I wasn't awake all that length of time. He'd shake the bed you know and I would wake up you know. You know he'd wake me up for doing it to them on the behind. . . . I just couldn't sleep through it." The appellant denied that Harris forced BJT to have sex with her. She specifically responded, "[BJT] ain't never had sex with me. Never a time, I am his mother."

As to Harris' anal rapes of eight-year-old RGT, the appellant's recollection of the number of offenses ranged from three to four, again following prompting by Investigator Chapman. The appellant recalled that on one occasion RGT was raped while lying on her bed. She admitted that she was present during this offense, but explained that on the other occasions she was not present. The appellant vehemently denied that she had been involved in any type of sexual relationship with RGT or that she had asked him to touch her inappropriately. In response to questioning by Deason, the appellant stated, "I'm their mother. I don't let them, I didn't let them do nothing like that to me. . . . They know I'd whoop them."

Additionally, the appellant recollected that her daughter, PMT, was also raped by Harris. She noted that, following an occasion when Harris had digitally penetrated PMT, the appellant went to Deason's office and advised Deason of Harris' actions. She related that Harris also had sexual intercourse with PMT.

The appellant admitted that, although she was aware of the offenses, she never attempted to stop Harris. The appellant acknowledged, "I know it wasn't right. I know it wasn't right I know that yea. I know it wasn't right." She could provide no reason for her failure to report the abuse following her initial complaint to Deason. The appellant concluded, "Well I didn't know

---

[4] The appellant was originally indicted as a result of this incident. However, prior to the jury charge, the State dismissed the charges involving RT.

he was going to do it till he don't say man I got in on the bed and doing them, doing it to them. And it was to[o] late then to. . ." When asked her opinion as to what should be done to Harris, the appellant stated, "[Ought to] put him away for this. I think that's low down and dirty. Don't you think so?"

Through conversations with witnesses, Investigator Chapman concluded that the offenses involving the appellant and Harris had occurred between November 1997 and February 1998. The appellant was originally indicted by the Giles County Grand Jury on five counts of misdemeanor child neglect, seven counts of criminal responsibility for rape of a child, two counts of felony child neglect, three counts of rape of a child, two counts of aggravated sexual battery, and one count of incest. Several counts of the indictment were later amended or nolle prossed.

On May 5, 1999, the trial court ordered the appellant transported to the Middle Tennessee Mental Health Institute (MTMHI) for a forensic evaluation to determine the appellant's mental competency to stand trial and to determine if an insanity defense could be supported. The appellant was admitted to MTMHI on May 26, 1999, and remained there until June 22, 1999. On October 26, 1999, and November 1, 1999, the trial court held a hearing to determine whether the appellant was competent to stand trial and whether the appellant's statement to Investigator Chapman should be suppressed.

A. Competency Hearing

The following facts were adduced at the competency hearing.[5] Dr. Glenn Sneed, a psychologist and director of psychology at Clover Bottom Developmental Center, testified at the hearing. Clover Bottom is a state-owned mental retardation facility which serves the Middle Tennessee region. Dr. Sneed stated that his area of expertise within the field of forensic psychology is mental retardation. Accordingly, in the instant case he was asked to assess the appellant "from the perspective of mental retardation."

Dr. Sneed evaluated the appellant in June 1999 when she was sent to MTMHI. He served on a team with Dr. William N. Regan, a psychiatrist; Dr. Joe Mount, a psychologist; and several other clinicians. During the appellant's nearly thirty-day stay at MTMHI, Dr. Sneed met with her for seven sessions, estimating that they had approximately two meetings per week.

As part of his assessment, Dr. Sneed concluded that the appellant did not understand the charges against her or the possible consequences associated with the charges. Dr. Sneed related that the appellant was "very confused about the basic judicial process" and, in his opinion, "did not have the capacity to cooperate with an attorney in her own defense." Specifically, Dr. Sneed noted that, "[a]s a part of every 30-day assessment period, we try to prepare a defendant to return to court as competent. In [the appellant's] case, however, she just did not show the ability to retain the

_____

[5] Judge Robert L. Jones presided over the competency hearing which occurred on October 26, 1999, and on November 1, 1999. Thereafter, Judge Jim T. Hamilton presided over the proceedings in the appellant's case.

-4-

concepts and to demonstrate them meaningfully." In sum, Dr. Sneed stated that, in his opinion, the appellant did not have the mental capacity to become competent.

Dr. Sneed explained that the appellant's limitations resulted from her moderate mental retardation, which retardation was evidenced by the appellant's IQ of 48. Dr. Sneed concluded that the appellant's mental retardation was caused by "a combination of birth, the organic impairment at birth, as well as extreme cultural, educational deprivation." Additionally, although the appellant's primary diagnosis was mental retardation, she also suffered from depression. Dr. Sneed noted that, while the appellant's depression is a treatable mental illness, the appellant's mental retardation is a permanent condition and is not treatable.

Further, Dr. Sneed related that the evaluation team concluded that the appellant did not appreciate the nature or wrongfulness of her offenses. He noted that, although the appellant made general statements concerning the wrongfulness of abusing children, "it was more cliche, very little insight, very little depth of understanding. It was easy to confuse her and trip her up." Moreover, he opined that it was likely that the appellant's perceptions were impacted by the incestuous environment in which she was raised.[6] On cross-examination, Dr. Sneed conceded that he had not reviewed the tape of the appellant's interview with Investigator Chapman.

Dr. Sneed noted that, although the appellant is moderately mentally retarded, she has acquired some "basic survival skills." The appellant reported that she essentially always looked for a boyfriend or tried to get married to someone who could take care of her. However, Dr. Sneed emphasized that, in determining competency, the primary emphasis in the evaluation was to determine whether she understood "what a judge does, what a prosecutor does, what a defense attorney does, and the interplay of those participants." Dr. Sneed related that when the appellant was asked if she understood the purpose of her admission to MTMHI, the appellant responded, "This is a minstitution, and they sent me here cause I child abused my kids." When the appellant was asked about the participants in the trial, she stated that her lawyer was there to help her and that the prosecutor was also there to help her. When asked about the role of the judge, she explained that the judge "sits up there on the desk and talks to you." She also concluded that the judge was always in a foul mood and ready to impose harsh sentences. Dr. Sneed determined that the appellant had no understanding of the jury's function. However, the appellant did have some perception that probation was preferable to a jail sentence.

Dr. Sneed explained that the appellant's concept of time was also impaired. Although the appellant understood that she was in trouble and could go to jail for a long time, the term "long time" was meaningless to her. The appellant was unable to name the current month, day, or year. Dr. Sneed concluded that "in her concept, one year is the same as ten years, or that type of thing." Furthermore, Dr. Sneed indicated that the appellant was not malingering or disguising her abilities.

---

[6] Dr. Sneed explained that, "according to the social worker information, [the appellant] was a victim of sexual abuse. But, also, her oldest child's father is [the appellant's] father. And her oldest daughter has a child by the father."

In response to the State's request for additional time to locate witnesses to testify regarding the appellant's competence, the trial court continued the competency hearing until November 1, 1999. At that time, the appellant called Dr. William N. Regan. Dr. Regan was a psychiatrist at MTMHI, and was part of the team which evaluated the appellant. Dr. Regan agreed with Dr. Sneed's conclusions regarding the appellant and also opined that the appellant was not competent to stand trial. Dr. Regan concluded that the appellant functioned on the level of a four- or five-year-old child. He noted that her understanding is very limited, explaining:

> She's very easy to lead. And I–I think you can almost talk her into anything. If you sit and say to her something like the prosecutor is going to let you go home, and you nod your head as you're saying it, she will nod her head, and she'll say, "Yes, that's true." It's like it–things really don't get across to her. And that can be right after you've told her that, you know, the prosecutor's job is to try and get a conviction.

Dr. Regan also stated that he saw no evidence that the appellant was malingering.

Regarding the appellant's competency to stand trial, Dr. Regan opined that "[i]t's the severe nature of her cognitive impairment, the mental retardation, that makes her unable to effectively assist her attorney in her own defense." Specifically, Dr. Regan related that the appellant

> has a very hard time learning even rudimentary basics, even to the point that you can tell her something, have her parrot it back to you, and you think she's got it, and then you come in the next day, and you're starting from scratch again. This–we went through this over and over with her.

In sum, Dr. Regan maintained that the appellant was clearly not competent to stand trial.

Dr. Joe Mount, a licensed psychologist and another member of the evaluation team at MTMHI, also testified on behalf of the appellant. Dr. Mount agreed with Dr. Sneed and Dr. Regan regarding the appellant's incompetency to stand trial. Dr. Mount noted that, immediately preceding the hearing on November 1, 1999, he met with the appellant and asked her about the role of the prosecutor and other primary court participants. The appellant was unable to correctly answer his questions. Dr. Mount concurred in the assessment that the appellant functions on the level of a four- or five-year-old. Specifically, he noted, "you can talk to her about something, and come back and ask her about it the next day, and it's like you've never talked to her about it." Dr. Mount likewise found no evidence that the appellant was malingering.

The State presented the testimony of three DCS employees. Mickey Pierce, Sherry Holly, and Candice Deason testified that they had been involved with the appellant and her family for several years. Additional witnesses, including two inmates who were incarcerated with the appellant, testified regarding the appellant's ability to care for herself. In general, the witnesses recounted that the appellant was able to wash clothes, clean house, and cook dinner. All of the witnesses acknowledged that the appellant needed to be addressed in simple terms in order to comprehend what she was being told.

At the conclusion of the proof, the trial court found the appellant competent to stand trial,[7] concluding:

> First, it appears undisputed that the [appellant], Ann Kelly, is moderately retarded and has an IQ of approximately 48; that she has, essentially, no formal education, but that she has, from living her 30 something–or 40 something years, and having several children, and several other relationships, developed some skills for getting by, or as one of the doctors said, some survival skills.
>
> The testimony of the witnesses that the State presented today suggested that she can identify colors; identify and write certain letters; is able, in recent weeks or months, to write her name; and that if she knows the day of the week, she can tell you what's on the jail's menu for that day since the menu apparently recycles each week.
>
> The Court finds that evidence is not inconsistent with, but instead is, consistent with the testimony of Drs. Sneed, Regan and Mount; and, that is, that this woman, while functionally an adult; physically, may be a four-, five- or six-year-old mentally. And I think this Court can take judicial notice, within some limits, of what a normal four-, five- or six-year-old could do with regard to identifying colors, writing and identifying letters, writing one's name, and remembering certain days of the week are indicators of what kind of food might be served on a given date.
>
> So the Court does find that she suffers from a significant mental defect that may go to her ability to understand the nature of the offenses charge[d] or the wrongfulness of the acts or be able to conform her conduct to that required by law. But those matters going to an insanity defense are for the ultimate triers of fact, and not for this Court to determine on a motion by the [appellant].
>
> With regard to her competency to stand trial and to advise her lawyer and cooperate with him in preparing for and trying the case, the Court finds that she obviously has far less ability to do that than a normal defendant. And as the [appellant's] education, mental capacity and general understanding of law and procedure decreases, then, conversely, the [appellant's] attorney has a far more difficult task in preparing for trial and providing a meaningful defense.

---

[7]   As we explain, *infra*, the trial court incorrectly applied the standard for determining insanity to its consideration of the appellant's competence to stand trial.

And the Court was sort of inclined at the end of the proof on the competency issue, but without having read [the appellant's statement to Investigator Chapman], to think that the [appellant] might not have the capacity to advise counsel and stand trial. But [that exhibit] is very persuasive in favor of the State on these issues.

It still shows a person with limited communication skills, and of limited intelligence. But it shows, also, that what she finally acknowledges Wayne Harris has done to her children is, quote, dirty, closed quote, and that because he's dirty, she would not marry him. . . . [She] had apparently little interest in protecting Wayne Harris. But she's quick to deny any wrongdoing on her part that she might have understood wrongdoing.

### B. Motion to Suppress

At the same hearing on November 1, 1999, the appellant moved to suppress her statement to Investigator Chapman, arguing that "[the appellant] doesn't really have the free will to exercise in that sort of situation." The trial court concluded that the appellant's statement should not be suppressed. Specifically, the trial court stated that "she [wa]s there voluntarily, maybe not originally understanding the context within which this interview is taking place." Although the court found that the appellant was moderately mentally retarded, he concluded that her statement showed the appellant's "exercise of free will, the exercise of basic understanding, and a voluntarily–a voluntariness in the responses given to the questions by the three interviewers."

### C. Trial

On March 19, 2001, the day prior to trial, the appellant asked for a rehearing of her competency motion. The trial court ruled that, "based on what I read [about the earlier competency hearing] . . . I'd have to concur with Judge Jones' ruling [and] find that she is competent." Regardless, on March 20, 2001, following jury selection, the appellant again moved for a rehearing on the competency issue based upon "[the mental health experts'] most recent assessment of her and the history that she's had and the fact that she has been through this jury selection process and they were able to talk to her in the middle of that process." The testimony of the doctors mirrored their previous assessment regarding the appellant's lack of competency. Specifically, Dr. Regan emphasized that the appellant was "befuddled" by the jury selection process and noted that when he asked the appellant who the jury was and what the jury did, the appellant responded that the jury was present "to testify against me." When asked how complete strangers would know enough about her to testify against her, the appellant responded that they would "lie" about her. Despite this testimony, the court again found that the appellant was competent to stand trial.

The State began presenting its proof on March 22, 2001. At trial, BJT testified that after his father died, he lived in a mobile home in Pulaski with his mother, the appellant; his sister, PMT; and his two brothers, RGT and RT. Additionally, BJT noted that Wayne Harris, his mother's boyfriend, was there "mostly every day" and was often intoxicated. In describing the home, BJT

explained that the mobile home had three bedrooms, with two of the bedrooms located at one end and a third located on the opposite end. BJT and RGT shared a bedroom just down the hall from the bedroom where the appellant and RT slept. PMT had her own room located at the opposite end of the mobile home.

BJT recalled that one night he was lying in his bed when Harris came into the room "crawled over the bed and pulled down my clothes and told me to stick my front part in his butt." BJT complied. On this occasion, RGT was also in bed with BJT. On another occasion, Harris came into the bedroom and stuck his finger in BJT's rectum. Another time, Harris anally penetrated BJT. On each occasion, BJT screamed because he was hurt and told Harris to get off of him. When these incidents occurred, the appellant was in her bedroom. However, she did not come into the room or make any attempt to stop Harris. Furthermore, BJT testified that on one occasion the appellant came into his bedroom, woke him, "[a]nd she like put her hand on mine and told me to put [my front part] in her front part." BJT contended that the appellant then had sexual intercourse with him. BJT was born on November 6, 1987, and was ten years old at the time of these offenses.

Regarding the appellant, BJT related that his mother was unable to read or tell time. When his father was alive, Otis Thornton did the grocery shopping and each day told the appellant which chores, such as laundry or cleaning house, needed to be done. BJT testified that his mother was unable to use a telephone without assistance.

RGT also testified to abuse by the appellant and Harris. On one occasion, he was anally raped by Harris. RGT screamed because of the pain but his mother did nothing to help him. On another occasion, the appellant came into his room and told him to have vaginal intercourse with her. RGT complied. Another time, the appellant came into RGT's room and told him to "suck her" breasts.

PMT testified that, in 1997 and early 1998, she was twelve years old. She lived with her mother and three brothers in a mobile home in Pulaski. Harris regularly came to the mobile home and often stayed overnight. He was frequently intoxicated. One night when Harris was at the mobile home, PMT was sitting on a couch in the living room with the appellant and Harris.[8] Harris was sitting between the appellant and PMT. Harris reached over and placed his hand between PMT's shorts and underwear, touching her vagina through her underwear. The next day, PMT told the appellant but the appellant did not believe her. On another occasion, Harris came into PMT's bedroom while the appellant was in the living room. Harris placed his hand inside PMT's shirt and touched her breast. He also put his hand inside her shorts and touched her vagina. Again, when PMT told the appellant, the appellant did not believe her. PMT denied seeing her mother or Harris abuse her brothers. PMT testified that she later moved out of the mobile home and went to live with her aunt and uncle; however, her brothers remained in the home.

---

[8] On cross-examination, PMT responded in the affirmative when asked if she was sitting between the appellant and Harris.

PMT confirmed that her mother was unable to tell time and related that on one occasion the appellant woke the children at 3:00 or 4:00 a.m., "while it was still dark outside," and told them to get ready for school. PMT explained that the appellant was afraid the children would be late getting to school. PMT read the children's school papers to the appellant because the appellant could not read or write.

Sue Ross, a pediatric nurse practitioner with the Our Kids Center in Nashville, also testified. Ross explained that "Our Kids Center is an outpatient facility at General Hospital and it predominantly provides medical evaluations to children that are alleged to have been sexually abused." On January 28, 1998, she examined PMT because of allegations of sexual abuse. Additionally, the parties read into the record the sworn testimony of Julie Elizabeth Rosof Williams. Williams, also a nurse practitioner at the Our Kids Center, conducted the examination of BJT and RGT. Williams related that both boys had a "normal examination." However, Williams explained that the results were not inconsistent with anal penetration by an adult's penis because any injuries would have had time to heal.

Sharon Kilpatrick Norwood related that she became acquainted with the appellant when both women were incarcerated in the Giles County Jail. The appellant explained to Norwood that she was in jail because she had "messed with her kids." Norwood testified that the appellant also told her that Harris had raped the appellant's three-year-old son, RT. The appellant told Norwood that the child screamed while being raped by Harris and that she went outside because she did not want to hear the child's screams. The appellant also told Norwood that she allowed the boys to "play with her." The appellant informed Norwood that Harris had told her to "play dumb" if questioned about the incidents. The appellant also told Norwood that she "wasn't capable of standing trial." Norwood confirmed that the appellant could not read; however, she testified that the appellant could count to twelve and could recall the jail's menu for each day of the week. Norwood admitted that, at the time of trial, she had a hearing pending on an alleged violation of probation.

Ross Glenn Rosson, the appellant's first cousin, testified on her behalf. Rosson testified that he had known the appellant all her life. Prior to her incarceration, he saw her regularly and helped manage her finances. Rosson explained that the appellant was removed from school after attending approximately one and one-half months of first grade. The appellant was unable to remain in school because "[t]hey could not keep her clothes on this girl. Not even in the first grade." Additionally, Rosson noted that from an early age the appellant had no comprehension regarding the value of money. Specifically, Rosson noted, "From the time I can remember [the appellant] didn't know a dollar bill from a five dollar bill or a nickel from a half dollar or a quarter or nothing else. That's the way it's been with [her] all her life." Moreover, he related that the appellant needs assistance grocery shopping and using a telephone.

Mickey Pierce, an employee of DCS, was the team coordinator responsible for child protective service investigations in Giles, Lawrence, Maury, and Marshall counties. At the time of trial, Pierce had been with DCS for approximately 25 years. She related that she first became involved with the appellant in 1984 following allegations of sexual abuse involving the appellant's

older children, Randy and Hazel. Shortly thereafter, Randy and Hazel were removed from the appellant's custody and placed in the custody of the appellant's father. Pierce conceded that in the summer prior to the children's removal and placement with the appellant's father, the appellant revealed to Pierce that she had been raped multiple times by her father and her brother.

Following the appellant's marriage to Otis Thornton in 1984, DCS regularly received referrals regarding the appellant and the children. Thornton frequently consumed alcohol, causing the appellant to become upset. During these incidents, the appellant often left home for several days or weeks. Another source of conflict between Thornton and the appellant was "concern . . . that [the appellant] was spending the night with men, going off with the men; she was never at home." Pierce explained that the appellant would simply walk out the door and leave with any man who "would pick her up and take her wherever."

For the next twelve to thirteen years, DCS's involvement with the family continued, with referrals coming in every two to four months. Most of the referrals related to the instability in the home resulting from Thornton's alcohol abuse. Pierce noted that during this time Thornton was the primary caretaker for the children. Although he frequently consumed alcohol, Pierce contended that he always seemed to be able to care for the children.

Pierce testified that when Thornton was drinking or when there was conflict in the home, the appellant would frequently call Pierce or the sheriff's department. Occasionally, the appellant became upset if Thornton left home early in the morning and did not return within two or three hours. Pierce always reassured the appellant and explained that Thornton had gone to work and "everything was okay."

After Thornton died in 1997, Homemaker Services came into the appellant's home in an effort to motivate the appellant and teach her to maintain her home and care for her children. Homemaker Services did an assessment of the family and prepared a plan to meet the family's needs. The plan proposed to teach the appellant to perform routine household chores. Specifically, Homemaker Services noted that the appellant should be taught to do laundry, care for clothing, wash dishes, change bed linens, clean the bathroom, and learn sanitation safety and trash and insect control. The plan also proposed that the appellant be taught to cook, care for the children, do her grocery shopping, pay bills, and perform other essential errands. Notably, the plan included teaching the appellant child care skills, enabling her to meet the physical and emotional needs of her children.

Pierce also testified regarding the social history of the family compiled by DCS, as well as the plan of care for each child. She explained that when DCS works with a family, a plan is devised which provides certain responsibilities the parent must meet in order for the children to remain in the home. Pierce reviewed the plan of care for each of the appellant's children and noted that the appellant had signed the documents by printing "Annn" or "Annnn" with no last name affixed. The plan of care for the appellant's children noted that the appellant needed to learn to write her name, properly supervise and discipline the children, prepare ten different meals, read basic

words, count money, and keep the children clean. Additionally, the appellant needed to find a house, obtain enough beds for herself and the children, and have someone manage her finances.

Pierce stated that the appellant could not be given directions in a general manner. An instruction to clean the house was much too general. Rather, the directions had to be simplified, such as telling her to wash the dishes, wash the clothes, or mop the floor. Pierce confirmed that, during the many years DCS worked with the appellant to improve the family's living conditions, little progress was made. Despite years of documentation regarding the appellant's limitations, the goal of the plan, quite incredulously, was to teach the appellant the required skills within a two month period. Pierce acknowledged that during the twelve to fourteen years of DCS's involvement with the appellant, there was little improvement. Pierce noted that DCS received referrals after Thornton's death because "there were people that were concerned of how she was going to maintain." Regardless, Pierce alleged that "in [the appellant's] case, she knew a lot. It was just she didn't want to do it." She also acknowledged that, despite little or no improvement in the appellant's parenting skills and the increasingly frequent referrals to DCS, the children were not removed from the home until several months after Thornton's death. However, Pierce opined that the appellant was "just lazy at times."

Dr. Regan, a forensic psychiatrist at MTMHI, testified that he routinely performed independent forensic evaluations for the State. Dr. Regan related that he was not hired by either party but operated as a "friend of The Court." Dr. Regan explained that patients are sent to MTMHI for a period of up to thirty days. While at MTMHI, he, along with a psychologist, social workers, and nursing staff, observes and monitors the patients "pretty much twenty-four hours a day for the entire thirty days" of the evaluation.

Dr. Regan noted that the appellant was at MTMHI from May 26, 1999, until June 22, 1999. Dr. Regan explained that in performing an evaluation the team typically reviews previous mental health examinations as well as social and medical history. Specifically, in the appellant's case, the team was able to review records from the appellant's childhood.

Dr. Regan further explained that the appellant was tested using the Wexler Adult Intelligence Scale, which he described as the "gold standard of testing IQ." The test was composed of eleven subtests which measured a variety of different types of intelligence and "from that you get a verbal performance and a full scale IQ." Dr. Regan explained that an average individual has an IQ of 100. Individuals with scores below 70 are classified as mentally retarded. Individuals with scores ranging from 70 to 55 are classified as mildly mentally retarded, and individuals with scores ranging from 55 to 35 or 40 are deemed to be moderately mentally retarded.

Dr. Regan concluded that the appellant's IQ score was in the mid-forties, congruous with a moderate level of mental retardation. This score was consistent with the results of IQ tests given to the appellant when she was sixteen to eighteen years old. Dr. Regan related that the appellant's performance skills, which relate to her ability to manipulate objects, was 37 and her verbal skills were 47. He concluded that the appellant's full scale IQ was 43.

Dr. Regan further explained that individuals who are classified as moderately mentally retarded are much less able to care for themselves than are those individuals with mild retardation. Moderately retarded individuals are "often labile, they're impulsive, they'll act out." A large number of moderately retarded individuals are institutionalized or live in group homes. Dr. Regan stated that the assessment of the appellant, including her social and mental history, confirmed that she functions at the level of a moderately retarded individual. Additionally, Dr. Regan noted that the appellant's social history reflected that, from an early age, she was subjected to profound sexual abuse by her father and an older brother.

Dr. Regan opined that similar to a five- to seven-year-old child, the appellant's ability for abstract thinking is extremely limited. She is able to comprehend concrete objectives such as cooking, washing dishes, and mopping a floor, but must be told repeatedly to do such chores. Dr. Regan stated that the appellant is easily led, noting that she watches facial cues and responds accordingly, regardless of the correct response. Dr. Regan postulated that the appellant's social upbringing affected her way of perceiving the world, concluding that "[t]he experiences that she's had make her what she is."

Based upon the foregoing proof, the appellant was convicted of two counts of rape of a child; three counts of criminal responsibility for rape of a child; one count of aggravated sexual battery; one count of criminal responsibility for aggravated sexual battery; and one count of incest. The trial court imposed a total effective sentence of sixty-two years incarceration. On appeal, the appellant contends that she was not competent to stand trial; that she should have been found not guilty by reason of insanity; that her statement to Investigator Chapman should have been suppressed; that the trial court erred by allowing Investigator Chapman to testify regarding the time and place of the offenses; that the trial court should have allowed her to impeach the testimony of RGT; that the evidence is not sufficient to support the convictions and the trial court erred in sentencing the appellant.

## II. Analysis[9]
### A. Competency

The appellant first contends that the trial court erred in finding her competent to stand trial. On appeal, the State concedes that the trial court erred, agreeing with the appellant that the evidence preponderates against the finding of competency.

Both the federal and state constitutions prohibit subjecting a mentally incompetent accused to trial. See U.S. Const. amend XIV; Tenn. Const. art. I, § 8; Pate v. Robinson, 383 U.S. 375, 378, 86 S. Ct. 836, 838 (1966); State v. Blackstock, 19 S.W.3d 200, 205 (Tenn. 2000). "The standard for determining competency to stand trial is whether the accused has 'the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing

___

[9] We commend both parties for supplying this court with excellent briefs which were of great assistance in addressing the issues raised on appeal.

his defense.'" Blackstock, 19 S.W.3d at 205 (quoting State v. Black, 815 S.W.2d 166, 174 (Tenn. 1991)); see also Dusky v. United States, 362 U.S. 402, 402, 80 S. Ct. 788, 789 (1960). The appellant bears the burden of establishing by a preponderance of the evidence her lack of competence to stand trial. State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). On appeal, this court will consider the trial court's findings conclusive unless the evidence preponderates against such findings. Id.

In Blackstock, our supreme court concluded that the evidence did not preponderate against the trial court's determinations that a defendant with an IQ of 55 was competent to stand trial. 19 S.W.3d at 206. Concluding that the issue was close, the court noted that no evidentiary hearing on the question of competency was held prior to trial. Id. Moreover, the only proof regarding competency consisted of one report from a mental health expert who found the defendant competent to stand trial. No additional expert or lay testimony was presented to establish that Blackstock did not have the capacity to understand the proceeding against him and to assist his attorney in his defense. Id.

Contrastingly, in the instant case all three mental health experts consistently testified that because of her moderate mental retardation, the appellant possessed no appreciable understanding of the judicial proceedings. In Van Tran v. State, 66 S.W.3d 790, 795 (Tenn. 2001), our supreme court observed that about one percent of the general population suffers from mental retardation; of this one percent, ten percent are moderately retarded. "A person with moderate mental retardation may learn to attend to self-care and perform basic work skills under supervision, yet can attain academic skills up to only the second grade level." Id. at 796. Describing the appellant, Dr. Sneed testified at the competency hearing that the appellant "did not understand her charges and the possible consequences. She was very confused about the basic judicial process. And she, in my opinion, did not have the capacity to cooperate with an attorney in her own defense." Furthermore, Dr. Sneed asserted that, "[b]ecause of the severity of [the appellant's] level of mental retardation," she was not competent to stand trial and it would not be possible for the appellant to become competent. Dr. Regan agreed with Dr. Sneed's assessment of the appellant's incompetency. When asked if the appellant's ability to learn concrete functions, such as cooking or writing her name, indicated her competence, Dr. Regan responded,

> The problem is, at this level of intellectual functioning, that they really cannot learn enough–it's a huge leap to go from saying that you can learn to write your name to–that you would be able to learn enough to be able to effectively assist your attorney and understand what's going on at trial.

Dr. Mount also testified that the appellant was not competent to stand trial, noting that the appellant could not correctly answer questions relating to the role of primary court participants. Dr. Mount revealed that due to the appellant's problems with the retention of information, it would be difficult for her to remember complex communications regarding court procedure or even correctly remember the events underlying her charges. For example, Dr. Mount stated that the appellant could not tell him the correct day, month, or year. Additionally, while the appellant could recite the correct

ages of her children when asked about each child by name, she could not consistently relate the correct number of children that she had. In sum, the three mental health experts agreed that the appellant was not malingering and they were unanimous in their assessment that the appellant was not competent to stand trial. Moreover, the defense provided the testimony of lay witnesses regarding the appellant's history and limitations.

To challenge the expert proof regarding the appellant's incompetence, the State presented testimony from lay witnesses, including DCS employees, who attested that the appellant could cook, do laundry, clean house, and write her name. In particular, the State submitted an audio tape and transcript of Investigator Chapman's interview with the appellant. The trial court ruled, based largely upon the interview, that the appellant was competent because she had the capability to recognize that the charged behavior was wrong. Specifically, the court found that the appellant "might not have the capacity to advise counsel and stand trial." However, the trial court determined that she was competent to stand trial because she "might have understood wrongdoing." As we earlier noted, the appellant's ability to recognize the wrongfulness of the conduct is not a consideration in determining the appellant's competency. Instead, the relevant question in determining competency is whether the appellant understands the proceedings against her and can assist in defending herself against the pending charges. See State v. Benton, 759 S.W.2d 427, 429 (Tenn. Crim. App. 1988). All of the evidence relevant to the appellant's competency uniformly supports the position that she is not competent to stand trial. Accordingly, we agree with the appellant and the State that the evidence preponderates against the trial court's finding that the appellant was competent. Therefore, the appellant's convictions must be reversed.[10] Nevertheless, in anticipation of further proceedings, we will briefly address the remainder of the issues raised by the appellant.

### B. Insanity

The appellant also complains that "[t]he jury erred in not finding [the appellant] not guilty by reason of insanity, there being clear and convincing evidence of her insanity introduced at trial, and the Court erred in not finding [the appellant] guilty by reason of insanity." The insanity defense became an affirmative defense on July 1, 1995. Currently,

> [i]t is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

---

[10] We note that because this court has concluded that the appellant is not competent to stand trial pursuant to Tennessee Code Annotated section 33-7-301(b)(1)(A) (2001), upon remand, the State may seek involuntary commitment for the appellant under Tennessee Code Annotated section 33-5-403 (2001). See Tenn. Code Ann. § 33-5-402 (2001).

Tenn. Code Ann. § 39-11-501(a) (1997). Evidence is deemed clear and convincing when "there is no serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence." State v. Holder, 15 S.W.3d 905, 912 (Tenn. Crim. App. 1999). Furthermore,

> [i]n determining the issue of insanity, the trier of fact may consider both lay and expert testimony and may discount expert testimony which it finds to be in conflict with the facts of the case. . . . [Moreover,] [i]n determining the defendant's mental status at the time of the alleged crime, the trier of fact may look to the evidence of his actions and words before, at, and immediately after the commission of the offense.

Id. (citations omitted).

Our supreme court recently "unanimously conclude[d] that appellate courts in Tennessee should apply [a] reasonableness standard when reviewing a jury's rejection of the insanity defense." State v. Christopher M. Flake, No. W2000-01131-SC-R11-CD, 2002 Tenn. LEXIS 375, at **38-39 (Jackson, Aug. 29, 2002) (publication pending). In other words, an appellate court should reverse a jury's rejection of the insanity defense "only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence." Id. at *39.

In the instant case, there was substantial proof that at the time of the offenses the appellant was suffering from the mental defect of moderate mental retardation. However, in Tennessee, the insanity statute also requires that such defect must render the appellant unable to appreciate the nature or wrongfulness of her acts. The proof presented at trial clearly demonstrated that the appellant was aware that the offenses perpetrated upon her children were wrong. The appellant went to Deason's office to complain about Harris' abuse of PMT. Moreover, in an evaluation submitted by Dr. Sneed, the doctor observed that the appellant maintained that "I'm a good mother that don't rape her kids!" At trial, Dr. Regan observed that a person suffering from moderate mental retardation would "understand right from wrong from the sense that you have told them that it's right or wrong, not that there's an internal sense of what's right and wrong." Furthermore, Norwood testified that the appellant told her that she was in jail because she "messed with her kids." The appellant also told Norwood that, when Harris raped RT "she got up and went outside because she didn't want to hear the baby scream." The proof demonstrates that the appellant appreciated the wrongfulness of raping children or touching children inappropriately. See id. at *46. As our supreme court noted, "[t]he [insanity] statute places the burden of establishing this affirmative defense squarely on the defendant." Id. at *40. We conclude that the appellant failed to meet her burden of establishing this defense by clear and convincing evidence. Accordingly, this issue is without merit.

### C. Admissibility of Statement[11]
As to the issue of the admissibility of the appellant's statement, the appellant contends:

---

[11] We will address the issues in a different order than they were raised in appellant's brief.

> The Court erred in not suppressing [the appellant's] statement. [The appellant's] statement to Investigator Chapman was involuntary. Appellant concedes that [the appellant] was not under arrest at the time the statement was given. However, in view of [the appellant's] limited mental ability, and the circumstances surrounding her "interview[,"] appellant takes the position that the authorities overreached in obtaining [the appellant's] statement.

In short, the appellant essentially argues that her statement, which functioned as a confession to wrongdoing, was involuntary.

Because the determination of whether the appellant voluntarily made a confession primarily requires a trial court to make findings of fact, we will defer to such findings on appeal unless the evidence preponderates otherwise. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001), cert. denied, 534 U.S. 948, 122 S. Ct. 341 (2001). However, any conclusions of law made by the trial court are reviewed de novo. Id. As the trier of fact at a suppression hearing, the trial court must determine the credibility of the witnesses, the weight and value of the evidence, and the resolution of conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Additionally, the prevailing party is entitled to the strongest legitimate view of the evidence presented at the suppression hearing, as well as all reasonable and legitimate inferences that may be drawn from such evidence. Id.

In the instant case, the State concedes that a non-custodial interrogation must be voluntary in order to be admissible. However, the State contends that coercive police activity is a necessary prerequisite to finding a confession involuntary. The State, citing State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting Rogers v. Richmond, 365 U.S. 534, 544, 81 S. Ct. 735, 741 (1961)), argues that the behavior of state officials must be "'such as to overbear [the appellant's] will to resist and bring about confessions not freely self-determined.'" Accordingly, the State concludes that the appellant's will was not overborne by coercive questioning and the statement was voluntary.

Both the Fifth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution provide protection against compulsory self-incrimination. "The significant difference between these two provisions is that the test of voluntariness for confessions under Article I, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992). One of the main protections against self-incrimination is the requirement that a confession be voluntary before it may be used against an accused at trial. See State v. Carter, 988 S.W.2d 145, 149 (Tenn. 1999). Notably, "[e]ven if Miranda warnings are not required, a confession cannot be used if it is involuntary." United States v. Macklin, 900 F.2d 948, 951 (6th Cir. 1990). "A confession is involuntary only if there is (1) police coercion or overreaching which (2) overbore the accused's will and (3) caused the confession." Hill v. Anderson, 300 F.3d 679, 682 (6th Cir. 2002); see also Colorado v. Connelly, 479 U.S. 157, 165-66, 107 S. Ct. 515, 520 (1986) and United States v. Brown, 66 F.3d 124, 126-27 (6th Cir. 1995). Nevertheless, "[w]hen a suspect suffers from some mental incapacity, such as intoxication or retardation, and the incapacity is known to interrogating officers, a 'lesser quantum

of coercion' is necessary to call a confession into question." Id. (quoting United States v. Sablotny, 21 F.3d 747, 751 (7th Cir. 1994)).

However, "[it is not] the case that a person who is mildly retarded is incapable of confessing a crime." State v. Greer, 749 S.W.2d 484, 485 (Tenn. Crim. App. 1988). As our supreme court recently remarked:

> "Mental retardation may have a significant impact on an individual who finds himself involved with the criminal justice system, particularly in the context of confessions and interrogations. It is well-recognized that mental retardation is not a per se bar to voluntary interrogations and confessions, although it may be a fact to be weighed in evaluating the voluntariness of a confession. Many mentally retarded people may be less likely to withstand police coercion or pressure due to their limited communication skills, their predisposition to answer questions so as to please the questioner rather than to answer the question accurately, and their tendency to be submissive."

Van Tran, 66 S.W.3d at 806 (quoting Lyn Entzeroth, Putting the Mentally Retarded Criminal Defendant to Death: Charting the Development of a National Consesus to Exempt the Mentally Retarded from the Death Penalty, 52 Ala. L. Rev. 911, 917 (2001)).

In Blackstock, our supreme court considered whether a mentally retarded defendant had voluntarily waived his Miranda rights. 19 S.W.3d 206-09. In determining that the waiver was not "voluntarily, knowingly and intelligently" made, the court cited State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994), explaining that

> [t]he relinquishment of the right must be voluntary in the sense that it is the product of a free and deliberate choice rather than the product of intimidation, coercion or deception. Moreover, the waiver must be made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

Id. at 208.

Additionally, the United States Supreme Court has observed that, although subtle forms of persuasion make an inquiry into the mental condition of a defendant significant, it is doubtful "that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" Connelly, 479 U.S. at 164, 107 S. Ct. at 520. As this court noted in Benton, 759 S.W.2d at 431:

> [T]he confession issue in the case at bar requires us to determine whether the defendant had the capacity in the first place to form a will of [her] own and to reject the will of others. Stated differently, we need not determine whether the defendant was overreached, but only whether [she] was ever reached.

Distinguishing <u>Connelly</u>, this court concluded that while Connelly's mental problem was schizophrenia, a "condition which. . .ebbed and flowed at intervals," Benton, like the appellant, suffered from mental retardation, a condition which is "static and never improves." <u>Benton</u>, 759 S.W.2d at 432. Moreover, Connelly approached officers on a public street and volunteered information regarding a murder he had committed. In <u>Benton</u>, *supra*, the defendant had an IQ of 47, functioned as a five- to seven-year-old child, and was found by mental health experts to be incompetent. <u>Id.</u> at 430. The defendant "was taken into custody, transported in a law enforcement vehicle to the Sheriff's Department, and subjected to questioning in spite of his retardation and the expressed desire of his father to be with him during the interrogation." <u>Id.</u> at 432. In the instant case, Investigator Chapman, Deason, and Workman went to the appellant's house to locate her after a miscommunication regarding a previously scheduled interview. At their request, the appellant's husband, Calvin Kelly, and the appellant followed the three interviewers to the courthouse. The interview was conducted in the judge's chambers while Calvin Kelly waited outside. Deason knew the appellant as a result of the appellant's involvement with DCS. The appellant trusted Deason to the point that she had reported Harris' abuse of PMT to Deason. Clearly, Deason should have been aware of the appellant's limitations. The questions posed by the interviewers were suggestive and the appellant's answers varied depending upon prompting by the interviewers. Notably, during the interview Investigator Chapman offered the appellant a cookie.

In view of the appellant's mental limitations and the circumstances surrounding her statement, we conclude that the appellant's statement was not voluntary and should have been suppressed.

## D. Chapman's Testimony

The appellant contends that the trial court erred in allowing Investigator Chapman to testify as to the time and place of the alleged offenses, contending that such information was hearsay. The State responds that Investigator Chapman testified that the information was the product of his own personal knowledge; therefore, the testimony was not hearsay.

At trial, the State asked Investigator Chapman if, during the course of his investigation of the alleged abuse, he "bec[a]me familiar with a situation where the [appellant] and the children were living during this time and sort of what time period involved and that sort of thing." Subsequently, the following colloquy occurred:

Appellant: Judge, I am going to object to any of that information[; it] would [be] hearsay.

Court: What was the question? I'm sorry.

State: Your honor, what I had asked the witness and we are going to have some le[e]way in this questioning of our witnesses. They are very small children, very young children who have little or no con[cept] of time or date[s] []and I was asking Investigator Chapman about some time reference.

In other words, if he was familiar with where the [appellant] and the children liv[ed] and in what time period we're talking about.

Appellant: Judge, my objection is hearsay because the only way he would know that information unless he observed during whatever specific time, unless he was there and sees where they lived.

Court: How do you know that's where they lived? What time period are we talking about?

Investigator Chapman: Yes, I knew where they lived from November of 1997 until February of 1998.

Court: Your own personal knowledge?

Investigator Chapman: Yes.

Court: I am going to overrule your objection.

State: Let me ask you this: This may help a little bit. Did you get some of this information from talking to [the appellant]?

Investigator Chapman: I did and from other sources.

State: And what place during that time period at what place or what general local[e] are we talking about where they lived?

Investigator Chapman: 1301 Mill Street here in Pulaski. Trailer number 4, which was at that time referred to as Town and Country Trailer Park.

State: That is located in Giles County?

Investigator Chapman: That's correct. It is, sir.

Later in Investigator Chapman's testimony, he stated that "[t]he investigation revealed that the time frame of these alleged occurrences would have been between November and prior to February or the middle of February of '98; November of '97 to February of '98."

Initially, we note that a trial court's admission of evidence is generally reviewed under an abuse of discretion standard. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). As reflected in the record, defense counsel objected to Investigator Chapman's testimony on the basis it was hearsay. In addressing the appellant's objection to Investigator Chapman's testimony, we must

-20-

address two separate issues. First, Investigator Chapman testified that he knew from his own personal knowledge that the appellant and the children lived in the trailer park in Pulaski from November 1997 until February 1998. Specifically, he explained that he interviewed PMT on December 2, 1997, and later spoke with the appellant. Although Investigator Chapman testified that some of his information was gained from speaking with the appellant and from other sources, neither the State nor defense counsel attempted to distinguish which information was based upon his personal knowledge and which information was gleaned from other sources. While Investigator Chapman could not testify to facts outside his personal knowledge, we cannot conclude based on the record before us that the trial court erred in admitting his testimony regarding where the appellant and her children lived during the time in question.

Conversely, we conclude that Investigator Chapman's testimony that the offenses occurred during the time frame from November 1997 to February 1998 was hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Clearly, Investigator Chapman was not present when the offenses occurred. Moreover, his testimony reflected that knowledge of the time frame of the offenses was derived through his investigation. Therefore, this testimony constituted hearsay. See State v. Catherine Ward, No. 01C01-9307-CC-00224, 1996 Tenn. Crim. App. LEXIS 71, at *27 (Nashville, Feb. 2, 1996). As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the rule against hearsay. See Tenn. R. Evid. 802. In the instant case, we can discern no applicable hearsay exception. Moreover, Tennessee Rule of Evidence 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." In other words, "a witness is not competent to testify about facts unless the witness personally perceived those facts by use of one of the witness's five senses." NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE, § 6.02[2], at 6-26 (LEXIS Publishing, 4th ed. 2000). Investigator Chapman acquired the information from others and there is no applicable exception to the personal knowledge rule that bars such testimony. Id. at § 6.02[5][c], at 6-31.

### E. Impeachment of RGT

Next, the appellant argues that "[t]he court erred in not granting [the appellant's] motion to limit the testimony and cross-examination of witness Chapman regarding the proposed impeachment testimony [concerning] the prior inconsistent statement of the victim [RGT], as indicated through [the appellant's] offer of proof on that matter." Essentially, the appellant contends that the trial court erred by not allowing her to introduce only certain portions of RGT's prior statements for the purpose of impeachment. However, because the record is incomplete, we are unable to address this issue.

At trial, RGT testified that the appellant told him to place his "front part" in her "front part." During cross-examination, RGT was asked if he recalled a prior conversation with Chapman and Deason in which he denied that he "ever had to put anything in [his] mother." RGT responded that he did not remember making the statement. Subsequently, at the end of the defense's proof, defense counsel asked the trial court to be allowed to recall Investigator Chapman for the purpose of

making an offer of proof as to RGT's prior statements. Chapman then identified two statements taken during interviews Chapman had with RGT on May 6, 1998 and July 9, 1998.

From comments reflected in the record, we surmise that defense counsel made some type of motion regarding the prior statements.[12] However, there is no specific reference in the record to a request made by the appellant regarding the prior inconsistent statements, nor is there a record of the trial court's ruling on any such motion. It is the appellant's duty to prepare a record which reflects a fair, accurate, and complete account of what transpired with respect to the issues which form the basis of the appeal. Tenn. R. App. P. 24(b). In the instant case, because the transcript of the proceedings relevant to the issue presented for review is not included in the record, this court is precluded from considering the issue. State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). Accordingly, in the absence of an adequate record on appeal, we must presume that the trial court correctly ruled upon this issue. Id.

### F. Sufficiency

The appellant next challenges the sufficiency of the evidence supporting her convictions. On appeal, the appellant, having been convicted by a jury, is presumed guilty. State v. Suttles, 30 S.W.3d 252, 260 (Tenn. 2000). Thus, the burden falls upon the appellant to demonstrate why the evidence is insufficient to support the jury's findings. Id. Evidence is considered insufficient when no reasonable trier of fact could have found the essential elements of the offense in question beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Moreover, as a result of the appellant's convictions, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Cottrell, 868 S.W.2d 673, 675 (Tenn. Crim. App. 1992). Additionally, we note that "[t]he weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact." State v. Manning, 909 S.W.2d 11, 13 (Tenn. Crim. App. 1995).

The appellant was convicted of the offenses of aggravated sexual battery, criminal responsibility for aggravated sexual battery, rape of a child, criminal responsibility for rape of a child, and incest. "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [if] [t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4) (1997). "Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (1997). Furthermore,

> [a] person is criminally responsible for an offense committed by the
> conduct of another if:

---

[12] In the appellant's brief, the appellant admits that "the transcript does not reflect that conversation on the record, although references are made to it. . . . Counsel will attempt to supplement the record with this additional testimony as well." However, there is no indication in the record that the appellant has attempted to supply this court with the additional evidence.

. . . .
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or
>
> (3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent the commission of the offense.

Tenn. Code Ann. § 39-11-402(2)-(3) (1997). Additionally, this court has previously observed that the

> presence of one at the commission of a felony by another is evidence to be considered in determining whether or not [s]he is [criminally responsible]; and it has also been held that presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred.

State v. McBee, 644 S.W.2d 425, 428-29 (Tenn. Crim. App. 1982); see also State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994). Finally, Tennessee Code Annotated section 39-15-302(a)(1) (1997) provides:

> (a) A person commits incest who engages in sexual penetration as defined in § 39-13-501, with a person, knowing such person to be, without regard to legitimacy:
>
> (1) The person's natural parent, child, grandparent, grandchild, uncle, aunt, nephew, niece, stepparent, stepchild, adoptive parent, [or] adoptive child.

Again, the appellant was convicted of criminal responsibility for the aggravated sexual battery of PMT; two counts of rape of a child, namely RGT and BJT; aggravated sexual battery of RGT; incest involving BJT; and three counts of criminal responsibility for rape of a child, two of which relate to BJT and one of which relates to RGT. We conclude that when the evidence in this case is viewed in the light most favorable to the state, as is required, the evidence is sufficient to support the convictions. The children testified graphically as to each offense perpetrated upon them. Additionally, the evidence showed that the appellant was in the mobile home, sometimes in the same bed, when Harris raped the children. RGT and BJT testified that they screamed and "hollered" while they were being raped by Harris. The appellant made no attempt to rescue the children or to stop Harris' abuse. Moreover, Norwood testified that appellant told her that she had "messed with her kids." RGT testified that appellant instructed him to place his "front part" in her "front part" and also told her to "suck" her breasts. Furthermore, BJT testified that the appellant came into his room, woke him, and instructed him to penetrate her vagina with his penis. This issue is without merit.

G. Sentencing

Finally, the appellant argues that the trial court erred in sentencing her to sixty-two years incarceration, specifically complaining about the length of the individual sentences and the imposition of consecutive sentencing. Initially, we note that, because of the trial court's misapplication of various factors, we will review the trial court's determinations de novo without a presumption of correctness. Tenn. Code Ann. § 40-35-401(d) (1997); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In any event, the burden is on the appellant to demonstrate the impropriety of her sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

We must consider the following factors in the course of our de novo review: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in her own behalf; and (7) the appellant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102 and -103 (1997), -210 (Supp. 2001); see also Ashby, 823 S.W.2d at 168.

In the sentencing analysis, the presumptive sentence for a Class A felony is the midpoint in the applicable range; however, for a Class B, C, D or E felony, the trial court must presume that the appellant is entitled to the minimum sentence within the appropriate range. Tenn. Code Ann. § 40-35-210(c). The appellant was sentenced as a standard Range I offender. Accordingly, the presumptive sentence for the Class A felonies of rape of a child and criminal responsibility for rape of a child was twenty years; the presumptive sentence for the Class B felonies of aggravated sexual battery and criminal responsibility for aggravated sexual battery was eight years; and the presumptive sentence for the Class C felony of incest was three years. Tenn. Code Ann. § 40-35-112(a)(1)-(3) (1997). The trial court should then "enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence as appropriate for the mitigating factors." Tenn. Code Ann. § 40-35-210(e).

The trial court found the following enhancement factors applicable, but did not clarify to which offenses the factors applied:

(2) The defendant was a leader in the commission of an offense involving two (2) or more criminal actors;

(4) A victim of the offense was particularly vulnerable because of age or physical or mental disability;

(5) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;

(7) The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement; and

(15) The defendant abused a position of public or private trust, or used a special skill in a manner that significantly facilitated the commission or the fulfillment of the offense.

Tenn. Code Ann. § 40-35-114(2), (4), (5), (7), and (15) (1997).[13] Furthermore, the trial court applied these mitigating factors:

> (1) The defendant's criminal conduct neither caused nor threatened serious bodily injury;
> (9) The defendant assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed the offenses; and
> (13) The defendant had no significant prior criminal history.

Tenn. Code Ann. § 40-35-113(1), (9), and (13) (1997).

On appeal, the appellant argues that the trial court improperly considered enhancement factor (5) in sentencing the appellant. Tenn. Code Ann. § 40-35-114(5). She contends that the proof reflected no evidence of cruelty over and above that inherently attendant to the crime. We disagree. In the instant case, the appellant remained in the home, often in the same bed, while her children were repeatedly sexually assaulted. Additionally, she told Norwood that she would leave the trailer upon hearing her children scream and cry while being raped. In State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001), our supreme court determined that the exceptional cruelty factor is applicable in cases of "extensive physical abuse or torture" or in cases where there is "proof of psychological abuse or torture." The victim impact statement submitted by PMT stated that the offenses "destroyed my family . . . [and] it caused me to lose respect for myself and others. It is also hard for me to trust anybody." At the sentencing hearing, Tressa Helton, with whom PMT resides, related that PMT "don't respect herself. And she's angry, too." Moreover, Dawn Robertson, the foster mother of BJT and RGT, testified that

> [t]hey have nightmares. . . . They have a lot of anger and madness, and they exert that in violence. . . . They are in counseling, now. They have to receive a lot of that. They were on medication for their psychological problems, which are – which is anger and violence. They sexually matured before their age.

Furthermore, in a victim impact statement she submitted on behalf of the boys, Robertson maintained that "[t]hey are both . . . emba[r]rassed of their names and want to change them so no one will know who they are." We conclude that this evidence is sufficient to support the application of enhancement factor (5).

Additionally, the appellant alleges that "there is no proof in the record to support the court's finding that enhancing factor [(2)] applied–that the defendant was the leader as between her and Harris." We disagree. "Our cases have established that enhancement for being a leader in the commission of an offense does not require that the [appellant] be the sole leader but only that [s]he

---

[13] Peripherally, we note that, beginning July 4, 2002, "[t]he 2002 amendment [to Tennessee Code Annotated section 40-35-114] added present [enhancement factor] (1) and redesignated former (1) through (22) as present (2) through (23), respectively." Tenn. Code Ann. § 40-35-114, Amendments (Supp. 2002). Thus, enhancement factor (2) becomes enhancement factor (3), enhancement factor (4) becomes enhancement factor (5), etc.

be 'a' leader." <u>State v. Hicks</u>, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). Accordingly, we find the proof supports the application of this enhancement factor.

The appellant also contends that the mitigating factors contained in Tennessee Code Annotated sections 40-35-113(2), (3), (8), (11), and (12) are applicable due to the appellant's mental retardation. We agree with the appellant that the trial court should have considered Tennessee Code Annotated section 40-35-113(8) because the appellant "was suffering from a mental . . . condition that significantly reduced [her] culpability for the offense[s]." We do not find the presence of the remaining mitigating factors.

Furthermore, in disputing the trial court's imposition of consecutive sentencing, the appellant argues, and the State concedes, that the trial court erred in finding that the appellant "is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the [appellant's] criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences." Tenn. Code Ann. § 40-35-115(b)(3) (1997). We agree. Nothing in the record indicates that any of the mental health experts deemed the appellant to be a "dangerous mentally abnormal person." The trial court erred in ordering consecutive sentencing on this basis.

However, the appellant concedes that consecutive sentencing is appropriate under Tennessee Code Annotated section 40-35-115(b)(5) because she was convicted of two or more statutory offenses involving sexual abuse of a minor. Nevertheless, the appellant offers that

> [her] actions did not go on for years. The time span was relatively short, and while the victim impact statements did allude to residual mental damage, that should be viewed in a relative manner. Also, the face of the [appellant's] sentence could change dramatically based upon the issues presented in this appeal. That notwithstanding, the Harris factor should not be overlooked as the apparent motivator and certainly the predator in this case.

While the appellant makes a persuasive argument, we conclude that the trial court did not err in imposing consecutive sentences due to the multiple convictions involving the sexual abuse of minors.

### III. Conclusion

Based upon the foregoing, we reverse the appellant's convictions due to the appellant's lack of competency to stand trial and remand to the trial court for further proceedings pursuant to Tennessee Code Annotated sections 33-7-301, *et seq.*, and 33-5-402, *et seq.*

_____

NORMA McGEE OGLE, JUDGE